941 So.2d 1073 (2006)
Anthony John PONTICELLI, Appellant,
v.
STATE of Florida, Appellee.
Anthony John Ponticelli, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-17, SC03-1858.
Supreme Court of Florida.
August 31, 2006.
Rehearing Denied October 23, 2006.
*1080 Linda McDermott of McClain and McDermott, P.A., Wilton Manors, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, for Appellee/Respondent.
PER CURIAM.
Anthony Ponticelli appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the trial court's denial of Ponticelli's motion for postconviction relief and deny Ponticelli's petition for writ of habeas corpus.

FACTS
On August 12, 1988, Anthony Ponticelli was found guilty of two counts of first-degree murder for the deaths of Nicholas and Ralph Grandinetti. He was subsequently sentenced to death. This Court affirmed Ponticelli's convictions and sentences on direct appeal. Ponticelli v. State, 593 So.2d 483, 485 (Fla.1991). The following relevant facts were provided in this Court's prior opinion:
According to testimony at trial, on November 27, 1987, Ponticelli was invited to watch video movies at the home of Keith Dotson, whom Ponticelli met while at a convenience store that afternoon. Ponticelli arrived at Dotson's house between 6:30 and 7:00 p.m. and stayed thirty to forty-five minutes. Later that *1081 evening he returned to Dotson's house in an automobile. Upon his return, Ponticelli told Dotson's cousin, Ed Brown, that there were two people in the car whom he intended to kill for money and cocaine. Ponticelli showed Brown a gun and told him he would need a ride back to his house. Brown agreed to give him a ride and gave Ponticelli Dotson's telephone number. When the phone later rang several times, Dotson and his friends intentionally did not answer it. Around 11:30 p.m., Ponticelli returned to Dotson's house in a taxi cab. He told those present that he had killed the two people in the car for cocaine and $2,000. Ponticelli asked Brown if he thought that a person would live after being shot in the head. Although Brown told him he did not think he had to worry about it, Ponticelli expressed concern, telling Brown that he had heard one of his victims moaning. After Ponticelli washed his clothes to remove blood stains, Brown drove him home.
According to testimony of Timothy Keese,[1] who lived with Ralph and Nick Grandinetti, on the evening of November 27, Keese saw Ponticelli at the Grandinetti brothers' home around 7:30 p.m. The three were discussing money Ponticelli owed the brothers for cocaine he had purchased from Ralph. Ponticelli told the brothers that he would sell whatever cocaine they had and then settle up with them. The brothers agreed to take Ponticelli to sell the cocaine. Keese left the house; and when he returned around 10:00 p.m. the Grandinettis were not at home. The brothers did not return that night.
The Grandinettis were found in their car the following day. Nick was found badly injured with his head on the floorboard of the car. He was gasping for air and kicking his foot when found. Nick's head was covered with blood and there was blood spattered all over the car. Ralph was found dead in the back seat. According to the medical examiner, Ralph died within one to two minutes of being shot once in the back of the head at close range.
Nick Grandinetti survived until December 12, 1987. An autopsy revealed that he had suffered two gunshot wounds to the back of the head. There were a number of bruises on the back and side of his head that were consistent with blunt trauma to the head. The skin on the right ear was peeling and red which was consistent with hot pressure being placed on the ear for an extended period of time. Nick died of cardiac arrest which was secondary to the gunshot wounds.
Ponticelli's best friend, Joseph Leonard, testified that around 9:30 p.m. on November 27, Ponticelli came to Leonard's house and returned a gun Leonard had given him. Ponticelli told Leonard that he "did Nick" which Leonard understood to mean that Ponticelli had shot and killed Nick Grandinetti. Ponticelli asked Leonard and his roommate what he should do with the bodies.
Leonard further testified that the next day Ponticelli told him that the Grandinettis had been harassing him about money that he owed them and were not going to let him leave their house until they got their money. The three left in a car. Ponticelli directed the brothers around the back roads trying to sell their cocaine. He then shot them both in the head. After dropping the gun off at Leonard's house, he had a flat tire so he left the bodies and took a cab home. Leonard eventually gave the *1082 police the murder weapon and a statement. After the murder weapon was given to police and statements from Leonard and his roommate were taken, Ponticelli was arrested.
There was also testimony that on the Sunday after the shootings, Ponticelli burned some clothes in Ronald Halsey's back yard. When asked why he was burning the clothes, Ponticelli told Halsey that he had shot two men whom he owed money for cocaine. He told Halsey that he shot both of the men in the back of the head and threw one of them in the back seat. The other man was still moving so he hit him a couple of times in the head with the butt of the gun. He parked the car when he had a flat tire and took several grams of cocaine and $900 in cash.
After his arrest for the murders, Ponticelli discussed the murders with a cellmate, Dennis Freeman, who testified at trial. According to Freeman, Ponticelli asked him if he would help him dispose of some evidence and drew Freeman a map showing the location of the evidence. The map had Keith Dotson's name and telephone number on it. Ponticelli told Freeman that he made several phone calls from the victims' house to get them to believe that he was trying to sell cocaine for them. He thought about killing the brothers at their home but there were other people there, so he asked the brothers to take him to Keith Dotson's house to sell the cocaine. After leaving Dotson's house, they drove to a place where he killed them. Ponticelli told Freeman that he shot the driver first with two shots to the head and then shot the passenger once in the head. One of the men was still alive. Ponticelli then drove to Joey Leonard's house, where he told Leonard and his roommate what he had done. He gave Leonard the gun and discussed disposing of the bodies. After he left Leonard's house, he had a flat tire, so he abandoned the car. He took a cab to Dotson's house where he washed his clothes which he later burned. Ponticelli told Freeman that he shot the brothers because he wanted to rob them of cocaine and money.
Ponticelli was charged with two counts of first-degree murder and one count of robbery with a deadly weapon. At the close of the state's case-in-chief, a judgment of acquittal was entered as to the robbery charge. The jury found Ponticelli guilty of both counts of first-degree murder and recommended that he be sentenced to death for each murder.[2] The trial court sentenced Ponticelli to death in connection with both convictions. The court found two aggravating factors applicable to both murders and a third factor applicable to the murder of Nick Grandinetti[3] and two mitigating factors in connection with both murders.[4]
Ponticelli, 593 So.2d at 485-86 (original footnotes omitted).
This Court denied Ponticelli's claims on *1083 direct appeal.[5] The United States Supreme Court vacated this Court's judgment and remanded the case for reconsideration in light of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Ponticelli v. Florida, 506 U.S. 802, 113 S.Ct. 32, 121 L.Ed.2d 5 (1992). Upon remand, this Court considered Ponticelli's challenge to the constitutionality of the jury instructions on the heinous, atrocious, or cruel (HAC) and cold, calculated, and premeditated (CCP) aggravators. Though it was determined that the jury instruction regarding the HAC aggravator was "even less detailed than that found insufficient in Espinosa . . . [and] [t]he same applies to the instruction on [CCP]," the claim was denied because Ponticelli's defense counsel had not objected to these instructions at the time of trial, thereby waiving Ponticelli's right to contest them. Ponticelli v. State, 618 So.2d 154, 154-55 (Fla.1993). The United States Supreme Court denied Ponticelli's second petition for writ of certiorari. Ponticelli v. Florida, 510 U.S. 935, 114 S.Ct. 352, 126 L.Ed.2d 316 (1993).
The current appeal arises from the trial court's denial of Ponticelli's fifth amended motion for postconviction relief.[6] On September 23, 1998, the trial court held a Huff[7] hearing and subsequently issued an order on November 3, 1998, denying thirty-two of the claims raised in Ponticelli's motion for postconviction relief. The November 3, 1998, order also granted an evidentiary hearing on the ineffective assistance and Brady[8]/Giglio[9] issues in the remaining nine claims. Beginning July 10, 2000, the trial court held a series of evidentiary hearings,[10] and on November 1, 2001, the trial court issued an order denying most of Ponticelli's claims. On September 9, 2004, in response to an order from this Court granting the State's motion to relinquish jurisdiction, the trial court issued a supplemental order denying Ponticelli's claim of ineffective assistance *1084 of counsel during the penalty phase. Ponticelli now appeals both orders and petitions this Court for a writ of habeas corpus. As explained below, we affirm the trial court's denial of Ponticelli's motion for postconviction relief and deny Ponticelli's habeas petition.

ANALYSIS
I. Appeal from Denial of 3.850 Motion for Postconviction Relief
A. Brady and Giglio Claims
Ponticelli claims the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in a number of ways throughout trial. In particular, Ponticelli asserts that the State violated Brady by not disclosing (1) the prosecutor's note following a telephone conversation with Dennis Freeman's defense counsel that indicated the State would not make a deal with Freeman but would remember his cooperation with favor in future proceedings; (2) the prosecutor's note following an interview with Timothy Keesee that allegedly indicated Keesee saw Ponticelli use cocaine at the Grandinettis' trailer on the night of the homicides; and (3) evidence that a number of witnesses told the state investigator that Ponticelli attended a party the night before the homicides.[11] Ponticelli also asserts that the State violated Giglio by presenting or failing to correct false or misleading testimony regarding (1) whether Freeman was promised a benefit in exchange for testifying in Ponticelli's case; (2) whether Keesee saw Ponticelli use cocaine in the twenty-four hours prior to the murders; and (3) the date Ed Brown, Warren Brown, and Brian Burgess (i.e., the "West Virginia boys")[12] first met Ponticelli. For the reasons explained below, we deny these claims.
1. Brady Claims
In Brady, 373 U.S. at 87, 83 S.Ct. 1194, the United States Supreme Court held that a prosecutor's suppression of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A true Brady violation requires that the defendant establish the following three elements: "(1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice." Johnson v. State, 921 So.2d 490, 507 (Fla.2005). To establish prejudice or materiality under Brady, a defendant must demonstrate "a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial." Smith v. State, 931 So.2d 790, 796 (Fla.2006) (citing Strickler v. Greene, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). "In other words, the question is whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. (quoting Strickler, *1085 527 U.S. at 290, 119 S.Ct. 1936). When reviewing these claims on appeal, we defer to the trial court's findings of fact but determine de novo whether the facts are sufficient to establish each element. Johnson, 921 So.2d at 507. In addition, we consider the evidence supporting these claims in light of the entire record. Marshall v. State, 854 So.2d 1235, 1251 (Fla.2003). As explained below, Ponticelli has failed to establish a Brady violation in respect to any of these claims.
a. Alleged Deal with Dennis Freeman
Ponticelli first claims that the State violated Brady by failing to disclose evidence of an alleged deal with Dennis Freeman. This claim revolves around the State's failure to disclose the prosecutor's note following a telephone conversation with Freeman's defense counsel. The note states:
Spoke with Fred Landt [Freeman's defense counsel] regarding Dennis Freeman. Told him I would make no firm offer prior to [Ponticelli's] trial but assured him his cooperation would be remembered with favor before mitigating judge/Sturgis. Will make no formal deal on the record prior to trial.
At the evidentiary hearing, the prosecutor testified that she did not believe this note indicated that she had promised to reward Freeman for his cooperation in Ponticelli's case, nor did she know whether Freeman had received any favorable treatment. Ponticelli's defense counsel testified at the evidentiary hearing that he believed this note indicated the State had made an unspecified deal with Freeman. Even if one accepts defense counsel's testimony as sufficient to establish the first two elements of Brady, Ponticelli's claim still fails because Ponticelli has not established that the State's failure to disclose this evidence resulted in prejudice. The evidence had only limited impeachment value and certainly does not rise to the level necessary to put the whole case in such a different light as to undermine our confidence in the verdict. See State v. Lewis, 838 So.2d 1102, 1116 (Fla.2002) (finding no showing of prejudice where impeachment value of undisclosed evidence would have been limited), cited in Mordenti v. State, 894 So.2d 161, 170 (Fla.2004).
Ponticelli alleges the suppressed evidence was prejudicial because it provided a basis for impeaching Freeman and would have led the jury to question both the truth of Freeman's testimony and the State's credibility. We disagree. First, this evidence was merely cumulative to that presented at trial. Cf. Guzman v. State, 868 So.2d 498, 508 (Fla.2003) (finding no prejudice under Brady because "[i]n light of the significant impeachment evidence presented at trial, evidence of the State's reward to [the witness] would have been merely cumulative"). Freeman was significantly impeached on his motive for testifying and his capacity for truthfulnessthe very factors that, according to Ponticelli, make this evidence prejudicial. During cross-examination, Freeman testified that he had previously worked undercover for the State, had frequently contacted the local sheriff's department with incriminating information on his fellow prisoners, and had testified as a jailhouse informant on at least one occasion. Freeman also testified that he had been less than honest about his history of cooperation with the State when he testified under oath at the pretrial deposition, that all of his twenty-six prior felony convictions involved crimes of dishonesty, and that he had been continuously incarcerated since December 9, 1985.
Given the significant amount of evidence impeaching Freeman's credibility as well *1086 as the State's credibility in calling him to testify, Ponticelli has not established that the State's failure to disclose the prosecutor's note before trial constitutes prejudice under Brady. See Marshall v. State, 854 So.2d 1235, 1251 (Fla.2003) (finding no prejudice under Brady when "defense counsel thoroughly cross-examined [the witness] and, in doing so, elicited testimony concerning" the subject of the State's alleged promise to the witness); but cf. Mordenti, 894 So.2d at 171 (finding prejudice when the undisclosed evidence refuted a critical issue at trial and the witness impeached by the evidence was the only one who was able to testify to this issue).
Furthermore, even assuming this evidence had some additional impeachment value, we find no reasonable probability that it would have led the jury to doubt the incriminating portions of Freeman's testimony. Freeman's testimony was incriminating to the extent the jury believed that Ponticelli had, in fact, confessed to the crimes. This testimony was corroborated by a map Freeman provided to the State on which Dotson's phone number was written in Ponticelli's handwriting and by a number of other witnesses who testified at trial that Ponticelli announced his intent to murder the Grandinettis and later admitted that he had done so. We find no reasonable probability that this evidence would have caused the jury to doubt Freeman's testimony. Therefore, we deny this claim.
b. Timothy Keesee's Statements
Ponticelli also alleges that the State violated Brady by failing to disclose evidence that Timothy Keesee had reported to the prosecutor and to the state investigator that he saw Ponticelli use cocaine at the Grandinettis' trailer on the night of the homicides. This claim is based upon the prosecutor's note following an interview with Keesee in which Keesee described the events taking place when he arrived at the Grandinettis' trailer on the night of the homicides. The note stated:
Owed them $300. R and N wanted it. Not physical. No threats. He was making calls to sell coke, collect money, doing cocaine.
At the evidentiary hearing, the prosecutor testified that "`R and N' was Ralph and Nick [Grandinetti]," but she was not sure which of the five persons Keesee claimed were present at the Grandinettis' trailer on the night of the homicides (i.e., Ralph Grandinetti, Nick Grandinetti, Keesee, Ponticelli, or Keesee's brother) was "doing cocaine." Keesee also reported the same information to the state investigator, who included it in a December 1987 supplemental report. This report was provided to the defense before trial. It stated that Keesee left the Grandinettis' trailer on the night of the homicides because of cocaine "usage" taking place there and because of a cocaine deal that was in process between Nick, Ralph, and a white male identified as Tony.
In its November 1, 2002, order, the trial court determined that while the prosecutor's note may have provided additional information of Keesee's knowledge of Ponticelli's drug use prior to the murders, it was neither exculpatory nor material. The trial court held that "[t]here is no way of knowing whether Trial Counsel would have gathered from [the note] that Defendant was using cocaine at the trailer on the night of the murders," and given the "overwhelming" evidence of Ponticelli's guilt, "no reasonable probability exists that the evidence regarding drug usage found in . . . [the] Prosecutor['s] interview notes would have changed the outcome of the guilt or penalty phase of [Ponticelli's] trial."
*1087 We affirm the trial court's denial of this claim. The note does not clearly indicate that Ponticelli was the person Keesee witnessed using cocaine on the night of the murders. Furthermore, even if defense counsel could have surmised from this note that Keesee told the prosecutor he saw Ponticelli using cocaine, we find no "reasonable probability that the undisclosed evidence would have produced a different verdict." Guzman, 868 So.2d at 506 (citing Strickler, 527 U.S. at 281 n. 20, 119 S.Ct. 1936). Defense counsel knew Keesee was an important witness in regard to this claim; counsel extensively questioned Keesee on this issue at trial; and counsel had the opportunity to confront Keesee with at least one document from the State that contained substantially the same information as the prosecutor's note. We find no reasonable probability that confronting Keesee with this note would have led Keesee to change his trial testimony; therefore, our confidence in the outcome is not undermined and we deny this claim.
c. Statements Regarding the Cocaine Party
Third, Ponticelli alleges that the State suppressed a number of pieces of evidence regarding the cocaine party that began the night before the homicides.[13] This allegation involves: (1) the state investigator's field notes following an interview with Timothy Letson in which Letson indicated that he had seen Ponticelli smoke cocaine in a manner consistent with that testified to by Burgess and Ed Brown at the evidentiary hearing;[14] (2) statements John Turner allegedly made to the state investigator indicating that he and Ponticelli used cocaine with the West Virginia boys the night before the homicides; and (3) Freeman's statements to the state investigator that Ponticelli had told Freeman he used cocaine with the West Virginia boys the night before the homicides. We agree with the trial court that Ponticelli has failed to establish a Brady violation in regard to any of these allegations.
The trial court addressed the investigator's field notes following his interview with Letson in the same way it addressed the prosecutor's interview notes following her interview with Keesee. The trial court found that these notes did not clearly indicate the information Ponticelli now alleges and that, even if they did, Ponticelli has not established that the suppression resulted in prejudice. We agree. The state investigator's field notes indicate that Letson saw Ponticelli use cocaine but do not indicate the date on which Letson witnessed the cocaine use. The fact that Ponticelli used cocaine was well accepted at trial. In fact, Turner testified at trial that he was with Ponticelli all day, every day for three or four weeks immediately preceding the homicides and that Ponticelli smoked "a bunch" of cocaine "all day long." There is no indication that the field notes would have indicated to defense counsel, much less that the State knew they would have indicated to defense counsel, that Letson saw Ponticelli use cocaine within the twenty-four hours preceding the homicides. Indeed, the evidence tying *1088 these notes to Ponticelli's cocaine use at the time of the crimes was Ed Brown's testimony, and at the evidentiary hearing, Brown denied telling the State about the cocaine party. Therefore, we affirm the trial court's denial of this claim.
In regard to Turner's alleged statement to the state investigator, the testimony at the evidentiary hearing indicated that Turner testified about the cocaine party in his deposition taken by defense counsel. "A defendant cannot show a Brady violation has occurred if the defendant knew of the existence of the evidence or in fact had the evidence." Knight v. State, 923 So.2d 387, 406 (Fla.2005) (quoting trial court's order).
Finally, Ponticelli claims the State violated Brady by not disclosing a statement Freeman allegedly made to the state investigator indicating that Ponticelli told Freeman he was with the West Virginia boys on the night before the homicides. Even if this allegation is true, we find no reasonable probability that this statement was material. Ponticelli refused to answer defense counsel's inquiries regarding Ponticelli's cocaine use at the time of the crimes. Moreover, at trial, all three of the West Virginia boys contradicted this statement in their sworn testimony.
We find no reasonable probability that cross-examining Freeman about an incident which he did not witness, but which was allegedly told to him by a defendant who refused to speak about this with his counsel, would have caused the jury to doubt the sworn testimony of three impartial witnesses at trial. Our confidence in the outcome is not undermined. Therefore, we deny Ponticelli's Brady claims.
2. Giglio Claims
In Giglio, 405 U.S. at 153-54, 92 S.Ct. 763, the United States Supreme Court extended Brady to claims where a key state witness gives false testimony that was material to the trial. To establish a Giglio claim, it must be shown that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Suggs v. State, 923 So.2d 419, 426 (Fla.2005). The third element of Giglio differs from the prejudice or materiality prong of Brady in that "once a defendant has established that the prosecutor knowingly presented false testimony at trial, the State bears the burden to show that the false evidence was not material." Guzman, 868 So.2d at 507. This requires the State to prove that the presentation of false testimony was "harmless beyond a reasonable doubt," id. at 506, or in other words, that "there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986), cited in Guzman v. State, No. SC04-2016, 941 So.2d 1045, 1050 (Fla. Jun.29, 2006). When reviewing these claims on appeal, we apply a mixed standard of review, deferring to the trial court's findings of fact but determining de novo whether the facts are sufficient to establish the elements required in each claim. Suggs, 923 So.2d at 426.
Ponticelli asserts that the State violated Giglio by presenting or failing to correct false or misleading testimony regarding (1) whether Freeman received any benefit from testifying in Ponticelli's case; (2) whether Keesee saw Ponticelli use cocaine in the twenty-four hours prior to the murders; and (3) the date the West Virginia boys first met Ponticelli. As explained below, we deny each of these claims.
a. Benefit to Freeman
Ponticelli first alleges that the State violated Giglio by allowing Freeman to testify that he did not expect to receive *1089 any benefit or special treatment in regard to his testimony, despite the fact that the prosecutor's note from her telephone conversation with Freeman's defense counsel stated otherwise. This claim is without merit. As we discussed earlier in regard to Ponticelli's Brady claim, even if we accept Ponticelli's allegation that the prosecutor's note indicates that Freeman was not honest when he testified that he did not expect to receive a benefit from cooperating in Ponticelli's case, we find no prejudice. While we recognize that the materiality prong in Giglio is more "defense friendly" than that of Brady, we find the State has met its burden of showing that this portion of Freeman's testimony, even if not entirely true, was "harmless beyond a reasonable doubt." Guzman, 868 So.2d at 506. As explained above, Freeman was significantly impeached on his capacity for truthfulness and his incentive for testifying against Ponticelli. Therefore, informing the jury that Freeman might be testifying falsely because of his hope for an unguaranteed, unspecified award would not have rendered him "sufficiently less credible in the jury's eyes" to establish a reasonable possibility that this contributed to the verdict. Therefore, we deny this claim. Cf. Marshall, 854 So.2d at 1252 (denying Giglio claim based on the State's alleged promise to a witness because "even assuming that the alleged promise was made," defense counsel impeached the witness regarding the subject of the promise, and the witness was not "the sole witness to testify in regard to the events surrounding the murder").
b. Keesee's Testimony Regarding Ponticelli's Cocaine Use
Ponticelli's second Giglio claim alleges that the State knowingly permitted Timothy Keesee to testify at trial that he did not see Ponticelli use drugs on the night of the homicides. This claim is also without merit. At trial, Keesee testified that when he and his brother arrived at the Grandinettis' trailer on the night of the homicides, he saw Ponticelli there discussing money Ponticelli owed the Grandinettis for prior cocaine purchases. Keesee testified that he saw cocaine sitting on the table in the trailer, but he did not see anyone using it.[15] At the evidentiary hearing, Keesee testified that this testimony was false, that he had seen Ponticelli use cocaine at the Grandinettis' trailer, and he certainly told the state investigator this, if not the prosecutor as well.[16] Keesee attributed his false testimony to the facts that (1) he was under the influence of cocaine at the time of his deposition and trial,[17] and (2) he wanted to "get out of the spotlight" in regard to his own drug use and criminal charges.[18] In addition to the *1090 prosecutor's interview notes and state investigator's report, which are described earlier in regard to Ponticelli's Brady claim, Ponticelli also alleges that a note the prosecutor jotted on Keesee's deposition testimony supports his Giglio claim. Next to Keesee's statement that he "[d]idn't see them do cocaine. Didn't tell anyone they did cocaine," the prosecutor had underlined "didn't tell anyone" and wrote in the margin "Told BM.[19] Taped."
At the evidentiary hearing, the prosecutor testified that she could not determine what the note in the margin meant. She testified:
I don't know if [the note] meant that I thought it was inconsistent with something [the state investigator] had, a tape [the state investigator] had made, or that if it was something inconsistent with something [the state investigator] had taped.
. . . .
I'm not sure if it was something that was a big dispute between [defense counsel] and I wanted to make a note that I thought that [Keesee] had said the same things somewhere else, he told [the state investigator] the same thing and it was a tape, or, like you're saying, that it's inconsistent with something that he had told [the state investigator] that was taped. So, I don't know.
. . . .
Oftentimes I'll put a question mark next to it too [to indicate that a witness may have made an inconsistent statement] and there's not a question mark.
Ponticelli's defense counsel disagreed with the prosecutor's interpretation of this note. He testified that he believed this note indicated that the prosecutor acknowledged that Keesee told the state investigator that Keesee saw Ponticelli use cocaine and that the prosecutor wanted to know if Keesee's statement was in a form that was available to the defense.
The trial court denied this claim because it found no evidence that the State "either knowingly presented, or allowed to be presented, perjured testimony at trial." It recognized that Keesee testified adamantly at deposition and at trial that he did not see Ponticelli use cocaine on the day of the crimes, and that "[r]eferences to drug use found in [the state investigator's] and [the] Prosecutor['s] notes are vague . . . It is understandable that [the prosecutor] and [the state investigator] could have overlooked vague statements in their notes when faced with this testimony." These findings are supported by competent, substantial evidence. The prosecutor's notation on Keesee's deposition testimony does not clearly indicate that the prosecutor knew Keesee was testifying falsely. At the evidentiary hearing, defense counsel and the prosecutor gave conflicting interpretations of this evidence. We defer to the trial court's findings of fact in regard to the resolution of conflicting testimony presented at the evidentiary hearing. See Sochor v. State, 883 So.2d 766, 785 (Fla.2004) (recognizing that the trial court must resolve conflicting testimony presented at the evidentiary hearing by assigning *1091 weight to each witness's testimony). Therefore, we affirm the trial court's denial of this claim.
c. Burgess's and Brown's False Testimony
Ponticelli's third and final Giglio claim alleges that the State violated Giglio by allowing Brian Burgess and Edward Brown to testify falsely at trial about the date they first met Ponticelli and whether they had ever seen Ponticelli use cocaine.[20] Burgess testified that his trial testimony was not completely accurate regarding the date he first met Ponticelli. At trial, Burgess testified that he first met Ponticelli around six or seven o'clock on the night the homicides occurred when Ponticelli appeared at Dotson's home and announced his intent to kill the Grandinettis.[21] At the evidentiary hearing, Burgess testified that he actually met Ponticelli at a cocaine party at Dotson's house that began Thursday night and continued into the early morning hours on Friday, the day the homicides occurred. Burgess testified that he, Brown, Ponticelli, and Turner left the party to purchase an "eight-ball" of cocaine from the Grandinettis' trailer, and when they returned, they all smoked some of it. Brown testified to very similar facts. He also acknowledged that, contrary to his trial testimony, the first time Ponticelli appeared at Dotson's was not after six or seven on Friday evening, but sometime Thursday night or early Friday morning at a party at Dotson's house. During this time, Brown, Burgess, Turner, and Ponticelli drove to the Grandinettis' trailer to purchase cocaine.
Brown testified at the evidentiary hearing that on the way back from the trailer, they stopped to purchase an orange juice container, which either Turner or Ponticelli fashioned into a pipe to cook the cocaine in the car. This contradicted Brown's trial testimony in which he stated that he had never used cocaine with Ponticelli.
Neither Brown nor Burgess testified that the State told him not to testify regarding Ponticelli's cocaine use, and Burgess testified that the rest of his trial testimony was truthful.
The trial court denied this claim because it found no evidence that the State knew these witnesses testified falsely. In its November 1, 2002, order, the trial court stated:
This Court does not find that the Prosecution either knowingly presented, or allowed to be presented, perjured testimony at trial. . . . Keesee, Brown and Burgess were adamant at deposition and at trial that they did not use drugs with the Defendant. Brown and Burgess were adamant at deposition and at trial that they did not meet Defendant until the evening of November 27, 1987, and that they did not use drugs with Defendant.
This finding is supported by competent, substantial evidence. As explained above, there was no evidence presented at the evidentiary hearing that the State knew that Burgess or Brown testified falsely; in *1092 fact, Burgess and Brown testified at the evidentiary hearing that they never told the State they saw Ponticelli use cocaine the night before the crimes because they did not know this was an issue in Ponticelli's case. Furthermore, each of the West Virginia boys presented consistent testimony at trial. Ponticelli has not established the second prong of Giglio in respect to this claim. See Rodriguez v. State, 919 So.2d 1252, 1269-70 (Fla.2005) (finding summary denial of Giglio claim appropriate, in part, because the witness's testimony was consistent with other witnesses who testified at trial). For the reasons explained above, we deny each of Ponticelli's Brady and Giglio claims.
B. Ineffective Assistance of Counsel During the Penalty Phase
Ponticelli claims that defense counsel was ineffective during the penalty phase because he failed to conduct an adequate investigation, failed to provide the mental health expert with crucial information regarding Ponticelli's background, and inadequately presented the mitigating evidence available during the penalty phase. Our analysis begins with the testimony presented at the evidentiary hearing to support this claim. Next, we provide the standard of review and applicable law that is applied to claims of ineffective assistance of counsel during the penalty phase. Finally, we apply this law to Ponticelli's allegations. For the reasons explained below, we affirm the trial court's denial of this claim.
1. Relevant Testimony Presented at the Evidentiary Hearing
At the evidentiary hearing, Ponticelli's defense counsel, as well as numerous lay witnesses and four mental health experts, testified regarding defense counsel's penalty phase preparation and the potential mitigation evidence available.
Defense counsel testified that Ponticelli's trial was his first capital trial, that he did not know how to conduct a penalty phase, that his only assistance came from a former deputy who was familiar with Freeman, and that the majority (80-85%) of his preparation was devoted to the guilt phase. His penalty phase investigation consisted largely of talking with Ponticelli's parents and asking them for names of persons who knew Ponticelli as a child in New York. Ponticelli's parents provided him with the names of some of Ponticelli's teachers, prior employers, and family members, but it does not appear that counsel contacted any of them. Counsel did not attempt to gather Ponticelli's school or medical records, and he testified at the evidentiary hearing that he had only a partial view of Ponticelli's drug use and background at the time of trial.
During the penalty phase, defense counsel called one witness, Dr. Robin Mills. Dr. Mills was one of the three court-appointed mental health experts who evaluated Ponticelli before trial and testified at the August 2, 1988, competency hearing. Mills was the only mental health expert who testified that Ponticelli was not competent to stand trial. At the penalty phase, Dr. Mills testified that he had twenty-five years' experience as a psychiatrist, much of which involved studying and treating patients addicted to cocaine and other mind-altering substances, and that he had presented expert testimony on this subject many times. Based on a hypothetical that defense counsel produced from the trial and deposition transcripts, Dr. Mills testified that both statutory mental health mitigators were present. He also testified that the personality change Ponticelli reportedly underwent when he was using cocaine was consistent with extreme cocaine addiction and warranted both statutory mental health mitigators. During *1093 defense counsel's penalty phase closing arguments, counsel connected Dr. Mills' testimony to the testimony the jury had heard less than two weeks earlier at the guilt phase. Ultimately, when imposing its sentence, the trial court did not find either statutory mental health mitigator because it found that, given the lack of evidence supporting Ponticelli's cocaine use within twenty-four hours of the crime, Mills' testimony was speculative.
In addition, a number of lay witnesses testified at the evidentiary hearing to Ponticelli's positive characteristics and the severe, adverse effect cocaine had on him. Family and friends described Ponticelli as a loving, docile child who had a difficult time fitting in during adolescence and whose personality changed during high school when he became involved in significant cocaine use. Approximately three years before the homicides, Ponticelli moved to Florida with his parents, and friends testified that he did not abuse cocaine at this time. Three or four weeks before the homicides, Ponticelli's cocaine use began again after he attended a cousin's wedding in New York. A cousin who attended this wedding described the cocaine use there as a binge, and friends who knew Ponticelli both before and after this visit testified that he changed from a calm, easy-going person with productive hobbies and steady employment to a paranoid person who did little else but use cocaine.
A number of witnesses testified that when on cocaine, Ponticelli frequently displayed episodes of extreme, irrational paranoia. A number of witnesses also testified that they saw Ponticelli acting paranoid around the time of the homicides.
In addition to these lay witnesses, four clinical mental health experts testified at the evidentiary hearing. Three of them testified on Ponticelli's behalf. One of these, Dr. Harry Krop, was also one of the court-appointed mental health experts who evaluated Ponticelli in preparation for the August 2, 1988, competency hearing. At the competency hearing, Krop testified that he believed Ponticelli was competent. More than twelve years later, at the evidentiary hearing, Krop testified that this evaluation enabled him to testify that both statutory mental health mitigators applied in Ponticelli's case. Krop testified that the report he issued following this first evaluation indicated that Ponticelli was voluntarily intoxicated at the time of the homicides, but Krop never spoke with defense counsel about this.
In preparation for the evidentiary hearing, Dr. Krop evaluated Ponticelli a second time. He then testified at the evidentiary hearing that both statutory mental health mitigators applied in Ponticelli's case. Ponticelli's two other mental health experts agreed. Dr. Barry Crown testified that neurological tests he conducted on Ponticelli in 1995 (seven years after trial) showed evidence of brain damage, primarily in the parts of the brain that control executive functions.[22] Crown neither interviewed witnesses nor considered Ponticelli's behavior at trial or around the time of the homicides, and he also acknowledged at the evidentiary hearing that this behavior exhibited significant mental functioning. Dr. Michael Herkov also testified at the evidentiary hearing on Ponticelli's behalf. Based on a September 1999 evaluation, Herkov testified that it was likely Ponticelli suffered brain damage at birth and that his significant cocaine use qualified him for both statutory mental health mitigators. Herkov also testified to the effects of cocaine, the fact that cocaine *1094 dissipates quickly, and that Ponticelli exhibited signs of severe cocaine addiction at the time of the crimes.
In rebuttal, the State presented a mental health expert, Dr. Wayne Conger, at the evidentiary hearing. Conger evaluated Ponticelli in July 2000 and testified that while he could not deny the fact that Ponticelli's brain may have been damaged by his cocaine use, he did not believe the damage was extensive enough to find incompetence or insanity. Conger also testified that Ponticelli was a normal functioning individual, both intellectually and cognitively. The facts surrounding the crimes demonstrated significant, goal-oriented behavior that was inconsistent with significant cognitive dysfunction and with the allegation that Ponticelli's cocaine use prevented him from reasoning effectively. Conger conducted many of the same tests as Crown and testified that the differences between his results and Crown's indicated that Ponticelli malingered when taking the tests. Even if he were to assume that Crown's tests were accurate, Conger testified that he did not believe the results supported Crown's hypothesis because the results revealed that Ponticelli had an antisocial personality disorder and a pattern of not complying with the lawnot a significant cognitive dysfunction. He did not believe either statutory mental health mitigator was present.
In addition to the clinical mental health experts, Ponticelli presented Dr. Marc Branch, a professor at the University of Florida who studies the effects of cocaine through animal research. Defense counsel had contacted Branch in 1988. In fact, counsel proffered Branch's testimony at trial, but the trial court ultimately excluded Branch's testimony because of the lack of evidence supporting Ponticelli's cocaine use at the time of the homicides. At the evidentiary hearing, Branch testified that even though he was not qualified to diagnose Ponticelli as having a cocaine psychosis, the lay witness testimony at the evidentiary hearing revealed that Ponticelli had demonstrated the "lynchpin" evidence of it.[23] Branch testified at the evidentiary hearing that in 1988 he would have been able to testify that Ponticelli was likely under a cocaine psychosis when he committed the homicides. Post-1988 research has enabled Branch to testify to this with almost complete certainty.
2. Standard of Review and Applicable Law
Ponticelli alleges his counsel rendered ineffective assistance during the penalty phase of his trial because defense counsel failed to adequately investigate the penalty phase and also made a number of errors in its presentation. "In order to prove ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient and that the deficiency caused prejudice." Suggs, 923 So.2d at 429 (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Deficiency requires a showing that "counsel's representation `fell below an objective standard of reasonableness,'" Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052), and prejudice in regard to the penalty phase requires a showing that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Sochor v. State, *1095 883 So.2d 766, 771 (Fla.2004) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Failure to establish either deficiency or prejudice results in the denial of the claim. Ferrell v. State, 918 So.2d 163, 172-73 (Fla.2005). Because the trial court denied these claims after an evidentiary hearing, this Court "review[s] the deficiency and prejudice prongs as `mixed questions of law and fact subject to a de novo review standard but . . . the trial court's factual findings are to be given deference.'" Arbelaez v. State, 898 So.2d 25, 32 (Fla.2005) (quoting Sochor, 883 So.2d at 781). Applying this standard to the case at hand, we deny these claims.
3. Analysis
In its September 9, 2004, order, the trial court denied this ineffectiveness claim. Regarding the lay witness testimony, the trial court found that Ponticelli "did not establish that he was prejudiced by counsel's failure to offer [this] testimony." The court recognized that much of this testimony was cumulative to that presented at trial since "counsel incorporated the witnesses from the guilt phase into consideration in the penalty phase." Furthermore, to the extent the testimony at the evidentiary hearing differed from testimony at trial, it would have had a negative effect on Ponticelli's case. As the trial court explained:
Instead of being a young man who naively experimented with drugs for a short period of time, the lay witnesses presented at the evidentiary hearing portray the Defendant as a man who escaped the ill effects of drugs for a substantial period of time in Florida and then returned to a habit he knew was evil.
The trial court found that Ponticelli had not established that evidence available to counsel at the time of trial demonstrated Ponticelli had used cocaine at the time of the crime. Furthermore, regarding the mental health expert testimony, the trial court summarized the testimony presented at the evidentiary hearing and found Dr. Conger's testimony to be the most credible. These findings are supported by competent, substantial evidence; therefore, we affirm the trial court's denial of this claim. While we find that defense counsel's investigation into mitigating evidence was inadequate and constituted deficient performance, Ponticelli has not established that this deficiency prejudiced him.
a. Deficient Performance
Ponticelli has established that counsel's penalty phase investigation and presentation were deficient. "An attorney has a duty to conduct a reasonable investigation for possible mitigating evidence." Jones v. State, 855 So.2d 611, 618 (Fla.2003). In determining whether counsel's investigation was reasonable, a court must consider "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Ferrell, 918 So.2d at 170 (quoting Wiggins, 539 U.S. at 527, 123 S.Ct. 2527).
Counsel's testimony at the evidentiary hearing and our review of the record reveal that counsel's penalty phase investigation consisted of interviewing Ponticelli's parents and asking Dr. Mills to testify. Counsel apparently failed to contact the persons suggested by Ponticelli's parents, made no effort to obtain any of Ponticelli's school or medical records, and did not request that Dr. Mills evaluate Ponticelli again before testifying at the penalty phase. While we recognize that a mental health evaluation is not required in every *1096 case, the record shows that Dr. Mills' penalty phase testimony was based on the fifteen-minute evaluation he conducted on Ponticelli before the competency hearing and his review of the record.[24]Cf. Arbelaez, 898 So.2d at 34-35 ("A competency and sanity evaluation as superficial as the one [the mental health expert] performed . . . obviously cannot serve as a reliable substitute for a thorough mitigation evaluation."); see also Sochor, 883 So.2d at 772 (finding counsel deficient when counsel introduced the reports of three mental health experts who testified during the guilt phase but did not "specifically instruct [the experts] to examine and evaluate [the defendant] for the purpose of establishing mitigating evidence").
Counsel's stated reason for not investigating this potential mitigation was that he did not know how to conduct a penalty phase. Inexperience is not an excuse for deficient performance. See Rose v. State, 675 So.2d 567, 573 (Fla.1996) (finding counsel deficient despite the fact that counsel's poor handling of the case was due, in part, to his inexperience). Furthermore, counsel's failure to investigate cannot be justified simply because Ponticelli refused to cooperate. While we recognize that Ponticelli willfully chose not to speak with defense counsel, there is no indication that he asked counsel not to pursue an area of mitigation or otherwise precluded a proper investigation. Cf. State v. Riechmann, 777 So.2d 342, 350 (Fla.2000) (finding counsel deficient for not investigating potential mitigation, in part, because although some of the defendant's statements indicated he did not want counsel to pursue this line of mitigation, the defendant did "not instruct [counsel] or preclude him from investigating further or presenting mitigating evidence"). Moreover, counsel's decision to present positive character evidence during the guilt phase does not free him from the strict duty to conduct a reasonable investigation into the penalty phase of trial. See Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) (citing Riechmann, 777 So.2d at 350, for the proposition that "[a]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence"); see also Lewis, 838 So.2d at 1113 (recognizing that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated"). Defense counsel's failure to conduct an adequate investigation resulted in a deficient penalty phase presentation. He presented only one witness at the penalty phase and asked this witness to base his testimony on a hypothetical that was not entirely accurate.[25] We agree with Ponticelli that counsel's penalty phase investigation and presentation were deficient.
b. Prejudice
Even though Ponticelli has established that defense counsel's penalty phase *1097 performance was deficient, he has not established that this deficiency prejudiced him. As in Arbelaez, 898 So.2d at 35, Ponticelli has failed to present the "fairly strong evidence" of mitigation that would be required to overcome the significant aggravators and the overwhelming amount of evidence convicting Ponticelli of these homicides. A number of witnesses testified at trial that Ponticelli first announced his plan to kill the Grandinettis; then, after following through on this plan, confessed that he did it and asked for help in covering it up. Furthermore, two of the three aggravating factors found for Nick Grandinetti's death, i.e., HAC and CCP, have been recognized as "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999).[26]
The lay witness testimony presented at the evidentiary hearing is certainly not sufficient to establish mitigators that outweigh these aggravators. As the trial court recognized, the testimony presented at the evidentiary hearing was largely cumulative to that presented at trial and to which defense counsel referred in his closing statement during the penalty phase. During the guilt phase, the jury heard a number of witnesses testify to Ponticelli's positive character and the effect of cocaine on his life. Ponticelli's father testified that Ponticelli worked a part-time job during high school and was a "good kid." John Turner, Ponticelli's close friend, testified that he was with Ponticelli every day after Ponticelli returned from his visit to New York and that Ponticelli used cocaine almost constantly during this time. Turner and Ponticelli's father also testified to Ponticelli's paranoid behavior when he was under the effects of cocaine, and Brian Burgess testified at trial that Ponticelli was acting nervous on the night he appeared at Dotson's. At the penalty phase, which occurred nine days after the guilt phase ended, defense counsel specifically connected the testimony regarding Ponticelli's paranoid behavior to his cocaine use. Counsel led Dr. Mills to testify that this paranoia was indicative of the mental health mitigators. On numerous occasions, this Court has denied ineffectiveness claims when the evidence presented at the evidentiary hearing was merely cumulative to that presented at trial. See, e.g., Holland v. State, 916 So.2d 750, 757 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1790, 164 L.Ed.2d 531 (2006).[27] This is true even when the mitigating evidence is presented during the guilt phase. See Gorby v. State, 819 So.2d 664, 675 (Fla.2002) (denying ineffectiveness claim based on counsel's failure to provide a witness to testify at the penalty phase when the witness's testimony was largely cumulative to the testimony of a mental health expert presented during the guilt phase). Therefore, Ponticelli has failed to establish that there is a reasonable probability that the result of the penalty phase proceeding would have been different if defense counsel had conducted a reasonable investigation into the lay witness testimony. See Sochor, 883 So.2d at 774 (deferring to the trial court's factual finding that even if defense counsel had adequately investigated *1098 the penalty phase, he would not have been able to present evidence substantially different than that presented at the penalty phase).
Ponticelli has also failed to establish prejudice in regard to the mental health testimony. "In assessing prejudice, `it is important to focus on the nature of the mental health mitigation' now presented." Asay v. State, 769 So.2d 974, 986 (Fla.2000) (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). First, neither Dr. Crown's nor Dr. Herkov's testimony was sufficient to establish mental health mitigation which would, in all reasonable probability, have outweighed the significant aggravators in this case. Neither testified that Ponticelli suffered from a major mental illness or was mentally retarded.[28]See Suggs, 923 So.2d at 435 (finding defendant was not prejudiced by failure to obtain an additional psychological evaluation in preparation for the penalty phase when postconviction expert found defendant suffered from a significant neurological impairment in the executive functions of the brain but had an "average IQ [of 102]" and "did not suffer from any major psychiatric disorder"). Furthermore, Herkov's and Crown's testimony that Ponticelli's brain damage rose to the extent necessary to establish the mitigators was based on findings that were directly contradicted by Dr. Krop and Dr. Conger. After weighing all the expert testimony, the trial court found Dr. Conger's testimony most credible, and we defer to the trial court's finding of fact when faced with conflicting expert testimony. See Sochor, 883 So.2d at 783.
Second, our finding that Ponticelli has not established that counsel's deficient investigation prejudiced him is supported by the fact that the mental health expert testimony presented at the evidentiary hearing is largely cumulative to Dr. Mills' testimony presented at the penalty phase. See Walls v. State, 926 So.2d 1156, 1170 (Fla.2006) (denying claim that defense counsel was ineffective for not presenting an expert to testify to the effect of Ritalin on the defendant's behavior and for not presenting a pharmacologist to testify to the effects of drug and alcohol abuse because this testimony was merely cumulative to that presented at trial). Dr. Mills unequivocally testified at trial that both statutory mental health mitigators applied in Ponticelli's case and that Ponticelli's paranoid behavior was consistent with an extreme cocaine addiction. While Dr. Crown and Dr. Herkov may have presented more compelling testimony at the evidentiary hearing, this is not dispositive. See Rivera v. State, 859 So.2d 495, 504 (Fla.2003) (citing Asay, 769 So.2d at 986, for the proposition that "counsel's reasonable mental health investigation and presentation of evidence is not rendered incompetent `merely because the defendant has now secured the testimony of a more favorable mental health expert'"). There is no reasonable probability that these experts would have led the trial court to find the mitigating factors at the time of trial. The trial court did not find the mitigators from Dr. Mills' testimony because there was no evidence Ponticelli had used cocaine on the day of the offenses, and none of the evidence presented at the evidentiary hearing to refute this finding was available to counsel at the time of trial, even after a reasonable investigation.[29] Therefore, we find that *1099 Ponticelli has not established that defense counsel's deficient investigation and presentation at the penalty phase prejudiced him.
C. Ineffective Assistance of Counsel During the Guilt Phase
Ponticelli also claims that defense counsel provided ineffective assistance during the pretrial and guilt phases of trial by: (1) failing to adequately investigate and present evidence that Ponticelli was incompetent at the time of trial; (2) taking inconsistent positions regarding Ponticelli's guilt by arguing both voluntary intoxication/insanity and reasonable doubt, and then failing to present evidence of voluntary intoxication; (3) conceding the truthfulness of the West Virginia boys' testimony, Freeman's statements, and the state investigator's credibility; (4) allowing the state investigator to be excluded from the rule prohibiting one witness from hearing another witness's testimony; and (5) failing to object to improper prosecutorial comments, failing to object to the admission of inflammatory and prejudicial evidence, and failing to effectively cross-examine witnesses.[30] Our analysis begins with the testimony presented at the evidentiary hearing that is relevant to this claim. Next, we provide the standard of review and applicable law; and finally, we apply this standard to each of Ponticelli's claims. For the reasons explained below, we deny each claim.
1. Facts Presented at the Evidentiary Hearing
The testimony at the evidentiary hearing regarding this claim involved defense counsel's strategy during the guilt phase and the issue of whether Ponticelli was competent to stand trial.
On July 5, 1988, defense counsel filed a motion for a psychiatric evaluation after Ponticelli declared he would not discuss this case with defense counsel because he had "turned the case over to God." The trial court appointed three mental health experts who evaluated Ponticelli before trial and testified at an August 2, 1988, competency hearing. Two of these experts, Dr. Harry Krop and Dr. Rodney Poettner, testified that they believed Ponticelli was competent. As discussed earlier, Dr. Robin Mills testified that Ponticelli was not competent.[31]
At the evidentiary hearing, Dr. Krop testified that for the first time in his professional career, he had changed his opinion regarding a defendant's competency. Dr. Krop testified that in 1988 Ponticelli presented a difficult case because he appeared candid, oriented, and coherent and did not exhibit any significant mental health issues or resentment toward the *1100 State or his defense counsel.[32] Yet, Ponticelli adamantly refused to speak with counsel about his case. On September 9, 1999, Dr. Krop evaluated Ponticelli a second time, and based on a report prepared in 1997 by the agency responsible for Ponticelli's adoption and the testimony at the evidentiary hearing regarding Ponticelli's significant cocaine use at the time of the crimes, Dr. Krop testified that there was sufficient evidence to find Ponticelli incompetent at the time of trial. Dr. Krop testified that he believed Ponticelli's religious convictions rose to the level of a delusion that prevented Ponticelli from communicating with counsel at the time of trial. Dr. Krop did not believe his original evaluation was inadequate, but rather that the new information helped sway a difficult case.
Dr. Michael Herkov and Dr. Barry Crown each agreed with Dr. Krop's findings at the evidentiary hearing. Dr. Herkov testified that Ponticelli's refusal to speak with defense counsel was due to a religious psychosis or delusion of reference that went above and beyond a jailhouse conversion and was likely spurred by the initial stress of being incarcerated.[33] Dr. Barry Crown testified that Ponticelli suffered from moderate brain damage, most likely caused by the deprivation of oxygen at birth and exacerbated by Ponticelli's cocaine use, which rose to the level of "cocaine kindling."[34] On cross-examination, Dr. Herkov testified that he could not render a specific diagnosis twelve years after the fact, and he believed Ponticelli understood the adversarial process and the charges against him. Dr. Crown admitted that he did not interview other witnesses or consider Ponticelli's behavior at the time of the homicides when he made this diagnosis.
The State's expert, Dr. Thomas Conger, disagreed with the other mental health experts. In Dr. Conger's opinion, Ponticelli exhibited unusual religious beliefs, but these beliefs did not constitute a delusion. Dr. Conger pointed to portions of the record that indicated Ponticelli had the ability to communicate with counsel. For example, Ponticelli stated, "That's false right there" to defense counsel when Dr. Krop made a statement at the competency hearing that Ponticelli disagreed with, and *1101 defense counsel's notes indicated that Ponticelli had called counsel from jail and provided him with the name of two potential mitigating witnesses.
Three former cellmates also testified to Ponticelli's strange behavior at the time of trial. They testified that they often saw Ponticelli pacing in his cell, at times with a cloth over his head, and constantly reading his Bible and praying. An inventory of his jail cell at the time of trial revealed eight Bibles; several friends and family members testified that Ponticelli wrote them long letters from jail that were fragmented and uncharacteristically religious; and defense counsel testified that Ponticelli's bizarre behavior continued throughout trial. Ponticelli's sister testified at the evidentiary hearing that Ponticelli's father was fundamental in his religious beliefs, but she had never known Ponticelli to be.
There was also testimony regarding defense counsel's strategy in this case and whether counsel was ineffective for not further investigating Ponticelli's mental health at the time of the crimes.[35] Counsel testified that he had two theories in regard to Ponticelli's defense: (1) an acquittal based on insanity or cocaine psychosis; and (2) second-degree murder based on the voluntary intoxication defense. At the time of trial, counsel truly believed he had all the evidence available to him, and he argued the alternative theories of cocaine psychosis and reasonable doubt during his opening statement because he had no evidence Ponticelli was under the influence of cocaine at the time of the offense. He testified that he would not have conceded that Ponticelli met the West Virginia boys four hours before the homicide if he had known the testimony presented at the evidentiary hearing. He also testified that he would not have made statements allegedly vouching for the state investigator's credibility if he had known the state investigator had withheld evidence.[36] Counsel also admitted that he did not follow up on Dr. Branch's suggestion to obtain a clinical mental health expert to testify at trial, even though Dr. Poettner gave him the name of an expert before trial.
2. Standard of Review and Applicable Law
Claims of ineffective assistance of counsel during the pretrial and guilt phases are reviewed under Strickland, 466 U.S. 668, 104 S.Ct. 2052. To establish this *1102 claim, a defendant must show that counsel's performance was deficient in that it "fell below an objective standard of reasonableness," Wiggins, 539 U.S. at 521, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052), and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Failure to establish either deficiency or prejudice results in a denial of the claim. Ferrell, 918 So.2d at 172-73. Because the trial court denied these claims after an evidentiary hearing, this Court "review[s] the deficiency and prejudice prongs as `mixed questions of law and fact subject to a de novo review standard but . . . the trial court's factual findings are to be given deference.'" Arbelaez, 898 So.2d at 32 (quoting Sochor, 883 So.2d at 781).
3. Analysis
For the reasons explained below, we find that none of the five allegations Ponticelli raises here constitute ineffective assistance under Strickland.
Ponticelli's first claim alleges that counsel was ineffective for waiting until a month before trial to file his motion for psychiatric evaluation and for failing to obtain jail records and to interview cellmates who would have provided additional information regarding Ponticelli's strange behavior. This claim is without merit. Ponticelli has not presented sufficient evidence to overcome the strong presumption that counsel's representation was reasonable. See State v. Duncan, 894 So.2d 817, 823 (Fla.2004) (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052, and recognizing that "[t]he defendant alone carries the burden to overcome the presumption of effective assistance"). He has provided no evidence that it was unreasonable for defense counsel to file his motion for a psychiatric evaluation a month before trial; in fact, counsel testified that he filed this motion as soon as he noticed Ponticelli consistently refusing to speak with him about the case. Furthermore, Ponticelli has provided no evidence that the mental health evaluations were inadequate because of lack of time or inadequate information. While the mental health experts who testified at the evidentiary hearing disputed one or two of the tests conducted or the results obtained in some of the 1988 mental health evaluations, none testified that all of the evaluations were inadequate. In fact, the 1988 evaluations took a similar amount of time and relied on similar tests as those conducted in preparation for the evidentiary hearing. Even Dr. Krop, who changed his opinion at the evidentiary hearing based on information largely not available to defense counsel at the time of trial, testified that his initial evaluation was adequate. Furthermore, there is no evidence Ponticelli's former cellmates revealed anything significant that the experts did not know when they evaluated Ponticelli. The cellmates' testimony was not a factor Dr. Krop pointed to when he decided to change his opinion. Having established neither deficiency nor prejudice, Ponticelli has not established counsel was ineffective in regard to this claim.
Ponticelli's second claim alleges that counsel was ineffective for taking inconsistent positions during opening argument without adequately investigating and supporting his voluntary intoxication defense. Ponticelli claims this action was per se ineffective because, in essence, counsel conceded Ponticelli's guilt.
In its November 3, 1998, order, the trial court found that defense counsel did not concede that Ponticelli committed the homicides, but the trial court permitted Ponticelli to question defense counsel about making a potentially inconsistent argument *1103 at the evidentiary hearing. Defense counsel testified that he presented alternative positions in his opening argument because he planned to present both defenses but was unable to do so when Dr. Branch's testimony was excluded because Ponticelli refused to discuss his cocaine use around the time of the crimes. The trial court ultimately denied this claim, finding counsel's approach was reasonable strategy and that Ponticelli's refusal to speak about his drug use prevented counsel from establishing the voluntary intoxication defense. This finding is supported by competent, substantial evidence; therefore, we affirm the trial court's holding that Ponticelli has failed to establish deficiency. See Brown v. State, 846 So.2d 1114, 1125 (Fla.2003) (citing Johnson v. State, 769 So.2d 990, 1001 (Fla.2000), for the proposition that "this Court will not second-guess counsel's strategic decisions on collateral attack"); see also Brown v. State, 894 So.2d 137, 146 (Fla.2004) (quoting Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000), for the proposition that "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions").
We also affirm the trial court's finding that even if defense counsel was deficient, Ponticelli has not established prejudice. Neither Dr. Krop, Dr. Crown, nor Dr. Herkov, who had all the evidence Ponticelli claims defense counsel was deficient for not obtaining, testified at the evidentiary hearing that Ponticelli was insane at the time of the murders. Moreover, because Dr. Branch was not qualified to testify to cocaine psychosis even if counsel could have provided him with the evidence presented at the evidentiary hearing regarding Ponticelli's significant drug history, he would not have been able to testify to this at trial. The fact that the jury did not hear his testimony does not undermine our confidence in the verdict. We affirm the trial court's denial of this claim.
Ponticelli's third claim alleges that counsel was ineffective for conceding the truthfulness of the West Virginia boys' testimony, the state investigator's credibility, and the truth of Freeman's statements. Ponticelli claims this action, in effect, entered a guilty plea without Ponticelli's consent and was per se ineffective. The trial court denied Ponticelli's claim regarding the West Virginia boys' testimony because even if counsel vouched for their credibility, there is no indication this was unreasonable because counsel did not know their statements were untruthful. The trial court also denied Ponticelli's claim regarding the state investigator because defense counsel did not vouch for the state investigator's credibility, and even if he did, Ponticelli has not established that this was unreasonable or resulted in prejudice. The trial court's findings are supported by competent, substantial evidence.
Counsel was not aware that Brown and Burgess testified falsely, as both men testified at the evidentiary hearing that they never told defense counsel about the cocaine party. Furthermore, defense counsel's statements to and about the state investigator during trial do not indicate that defense counsel was vouching for the investigator's credibility, and Ponticelli has not established that the investigator was not credible.
Finally, in regard to Freeman's statements, the trial court did not address this claim, but we find it without merit. As we explained in regard to Ponticelli's Brady and Giglio claims, Freeman's credibility and capacity for truthfulness were significantly impeached by defense counsel at trial. Moreover, his testimony was corroborated by the evidence presented at trial. We do not find counsel's conduct deficient *1104 given the context of these statements and the circumstances at trial. Therefore, we deny this claim.
Ponticelli's fourth claim alleges that counsel was ineffective for allowing the state investigator to be excluded from the rule of witness sequestration. In its November 1, 2002, order, the trial court determined that defense counsel had made a strategic decision not to object to the state investigator's presence in the courtroom because defense counsel had no basis to object. Ponticelli has not established that this strategy was unreasonable. The trial court has great discretion regarding the rule of sequestration, and this Court has more than once upheld the trial court's decision to permit a state detective to sit through trial. See, e.g., Knight v. State, 746 So.2d 423, 430 (Fla.1998) (finding trial court did not abuse its discretion in granting State's motion to allow a detective to remain in the courtroom when investigator was a fact witness); see also Randolph v. State, 463 So.2d 186, 191 (Fla.1984) (recognizing that the "rule of witness sequestration is not an absolute rule," and that trial court did not abuse its "sound judicial discretion" in allowing the state investigator to remain in the courtroom because the investigator was not "a principal actor in the crime," or a witness whose testimony "was actually suggested by what he heard in the courtroom").
Furthermore, even if counsel should have objected, Ponticelli has not established that the presence of the state investigator prejudiced him. While Turner testified at the evidentiary hearing that he felt intimidated by the state investigator's presence, there is no evidence the investigator did anything at trial that affected Turner's testimony. In fact, the state investigator's presence did not prevent Turner from testifying to Ponticelli's significant cocaine use in the weeks immediately preceding the homicides. Ponticelli has not established that the state investigator would have been excluded upon defense counsel's objection or that a reasonable probability exists that this exclusion "led to an improper conviction." Randolph, 463 So.2d at 192 ("We cannot say that the presence of [the detective] in the courtroom led to an improper conviction."). Therefore, his claim was properly denied.
Ponticelli's fifth claim alleges counsel was ineffective for failing to object to improper prosecutorial comments and the admission of inflammatory and prejudicial evidence lacking in relevance and for failing to competently cross-examine witnesses. These claims are legally insufficient because Ponticelli has not alleged how he was prejudiced by each of these deficiencies. See Waterhouse v. State, 792 So.2d 1176, 1181 n. 10 (Fla.2001) (finding procedurally barred claims couched as conclusory allegations of ineffective assistance of counsel were facially insufficient where the defendant did not allege how he was prejudiced by the failure to object).
D. Denial of Competent Mental Health Assistance
Ponticelli claims he was denied the assistance of a competent mental health expert at the time of trial. This claim is nothing more than an attempt to relitigate the trial court's determination that Ponticelli was competent to stand trial. Therefore, it is procedurally barred because it was raised and denied on direct appeal. Ponticelli, 593 So.2d at 487. Second, even if this were a valid Ake[37] claim, *1105 it remains procedurally barred because it should have been raised on direct appeal. See Whitfield v. State, 923 So.2d 375, 379 (Fla.2005). Third, if it could be read as a claim that counsel was ineffective for failing to provide Ponticelli with a competent mental health expert, it is without merit. See Correll v. Dugger, 558 So.2d 422, 426 (Fla.1990) (finding that testimony at evidentiary hearing that defendant likely suffered brain damage from his significant drug use did not justify a finding that defendant was denied the assistance of a competent mental health professional because original experts knew of defendant's drug use). Therefore, we deny this claim.
E. Inappropriate Summary Denial of Claims
As stated earlier, the trial court summarily denied all but nine of the forty-two claims Ponticelli raised in his fifth amended motion for postconviction relief. On appeal, Ponticelli asserts the summary denial was inappropriate in regard to a number of allegations of trial court error, including the trial court's decision to (1) find him competent, (2) deny his motion to exclude Freeman's testimony, and (3) improperly instruct the jury on the aggravators and its role in the sentencing process. Because each of these claims is either procedurally barred or facially insufficient, we affirm the trial court's summary denial of them.
"To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record. Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record." Peede v. State, 748 So.2d 253, 257 (Fla.1999) (citation omitted) (citing Fla. R.Crim. P. 3.850(d) and Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla.1989)). Each of the claims at issue here meets this standard. Ponticelli's first and third claims, i.e., that he was incompetent to proceed and that the trial court issued improper jury instructions, were considered and denied by this Court on direct appeal. See Ponticelli, 593 So.2d at 487; Ponticelli, 618 So.2d. at 154-55. Therefore, these claims are procedurally barred. See Johnson v. State, 522 So.2d 356, 357 (Fla.1988) (finding claim raised in a 3.850 motion procedurally barred because the claim was raised and rejected on direct appeal). Furthermore, Ponticelli's second claim that the trial court erred in denying counsel's motion to exclude Freeman's testimony is also procedurally barred because it could and should have been raised on direct appeal. See Bruno v. State, 807 So.2d 55, 63 (Fla.2001) ("A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion. . . ."). Ponticelli's second claim is also facially insufficient since Ponticelli presented *1106 no evidence at the evidentiary hearing that Freeman was a state agent, and defense counsel testified at the evidentiary hearing that Ponticelli's refusal to testify in support of this motion at trial prevented counsel from presenting a potentially valid motion. We therefore affirm the trial court's summary denial of each of these claims.
II. Petition for Writ of Habeas Corpus
In his petition for writ of habeas corpus, Ponticelli claims that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that Ponticelli's death sentence was unconstitutional, and that appellate counsel rendered ineffective assistance. As explained below, we deny all of these claims.
A. Florida's Capital Sentencing Procedure is Unconstitutional
Ponticelli claims Florida's capital sentencing procedure is unconstitutional in light of Ring, 536 U.S. 584, 122 S.Ct. 2428. This claim is without merit. Ponticelli's convictions and sentences became final in 1993, nearly nine years before the United States Supreme Court decided Ring. Both the United States Supreme Court and the Florida Supreme Court have held that Ring does not apply retroactively. Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004); Johnson v. State, 904 So.2d 400, 408-09 (Fla.2005). Therefore, this claim is without merit.
B. Ponticelli's Conviction and Sentence are Unconstitutional
Ponticelli claims his convictions and sentences are unconstitutional because the aggravating circumstances were not charged in the indictment as is required by Ring, 536 U.S. 584, 122 S.Ct. 2428, and by Florida law mandating that every element of the offense be alleged in the information or indictment. This claim is without merit. As explained above, Ring does not apply retroactively to Ponticelli's case. Moreover, we have repeatedly rejected similar claims. See Orme v. State, 896 So.2d 725, 736-37 (Fla.2005).
C. Ineffective Assistance of Appellate Counsel
In his third and final claim, Ponticelli alleges that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence supporting his convictions on direct appeal, failing to challenge the prosecutor's knowing presentation of false evidence, and failing to correct prosecutorial misconduct on direct appeal. We find these claims to be without merit.
When evaluating claims of ineffective assistance of appellate counsel, this Court applies a standard similar to that enunciated in Strickland. "The `[p]etitioner must show (1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and (2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.'" Smith, 931 So.2d at 805 (quoting Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985)). Ordinarily, counsel cannot be considered ineffective for failing to raise issues that are procedurally barred because they were not properly raised by trial counsel or that are without merit. Id. (citing Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)). As explained below, none of Ponticelli's claims have merit.
Ponticelli's claim that appellate counsel was ineffective for failing to challenge *1107 the sufficiency of the evidence is without merit. This Court reviewed the record on direct appeal and found "that the verdicts are supported by competent and substantial evidence of guilt." Ponticelli, 593 So.2d at 489. As in past cases, "[w]e decline to re-address an issue that has already been considered and resolved on the direct appeal." Patton v. State, 878 So.2d 368, 377 (Fla.2004). Furthermore, since our independent review revealed that Ponticelli's claim was without merit, appellate counsel cannot be deemed ineffective for failing to raise it on appeal. See Smith, 931 So.2d at 805.
Ponticelli's second claim is also procedurally barred and without merit. This claim rests largely on Ponticelli's allegation that the prosecutor suppressed evidence or presented false testimony, and the claim is procedurally barred because it is litigated in his motion for postconviction relief. See Randolph v. State, 853 So.2d 1051, 1068 (Fla.2003) (denying habeas claim that was a claim from 3.850 appeal couched as ineffectiveness of appellate counsel argument). Moreover, even if this claim were not procedurally barred, Ponticelli has not established that counsel objected to the prosecutor's statements at trial. Consequently, appellate counsel cannot be found ineffective for not raising them on appeal because Ponticelli has not established that the prosecutor's statements constituted fundamental error. See Miller v. State, 926 So.2d 1243, 1261 (Fla.2006). Therefore, we deny this claim.

CONCLUSION
For the reasons explained above, we affirm the trial court's order denying Ponticelli's motion for postconviction relief and deny Ponticelli's petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., concurring in part and dissenting in part.
Those searching for a poster child for the evils of cocaine addiction need search no further. While there appears to be little doubt that Anthony Ponticelli is guilty of the homicides at issue, there is also little doubt that his only chance for life rested in the hands of counsel that was ineffective in failing to competently investigate the circumstances surrounding the crime and Ponticelli's background of cocaine addiction, including Ponticelli's heavy consumption of cocaine in the time immediately preceding the killings of the two drug-dealer victims. Hence, Ponticelli's only genuine case for a life sentence was never fully developed and presented to the jury. As noted by the majority, the only mitigation found by the trial court was Ponticelli's age of twenty and his lack of a significant history of criminal activity. Critically, the trial court expressly refused to find the two important statutory mental mitigators because of the lack of evidence of Ponticelli's drug consumption in the immediate time period before the killings. For the same reason, the trial court refused to allow into evidence the testimony of a defense expert that Ponticelli was in a drug-induced psychosis at the time of the killings.
In addition to counsel's failures, it is apparent that the State allowed false testimony to be presented by its witnesses on this key issue. The State acknowledged at the postconviction hearing that Ponticelli's drug use in the period immediately preceding the killings was a critical issue at trial. Nevertheless, the State permitted false *1108 testimony to be presented on this issue that the State's investigator knew to be false. The State's investigator was told by witness Tim Keesee, who resided with the victims, that he witnessed Ponticelli consume cocaine at the victims' residence shortly before the killings occurred. Keesee also testified that he gave this same information to the prosecutor. Nevertheless, the State allowed Keesee to testify falsely that he witnessed no cocaine use by Ponticelli before the killings. In addition, the State's investigator was told by the jailhouse informant, Dennis Freeman, that the West Virginia boys had gone with Ponticelli to purchase cocaine from the victims the day of the killings. Again, however, the State stood by while the West Virginia boys provided false testimony as to their knowledge of Ponticelli and his drug consumption with them in the hours preceding the killings.
In its order denying postconviction relief the court made factual findings supporting the defendant's Giglio claim:
Upon consideration of the evidence presented at hearing, this Court finds the following facts in relation to this claim:
1) Investigator Munster's December 1987 Supplemental Report mentioned "cocaine usage" at the Grandinetti's trailer on the day of the murders. This report was supplied to Trial Counsel; however, he had no way of knowing that the reference meant that Defendant was using cocaine at the trailer the night of the murders.
2) Investigator Munster's field notes, which were not disclosed to the defense until 1997, provide further evidence of cocaine use at the Grandinetti's trailer on the night of the murder. The State simply overlooked this information. There is no way of knowing whether Trial Counsel would have gathered from those field notes that Defendant was using cocaine at the trailer on the night of the murders.
3) Investigator Munster testified that Tim Kesee told him about cocaine use at the Grandinetti's trailer the night of the murders. This information was not turned over to the defense.
4) Prosecutor Balius' interview notes with Tim Kesee may indicate that Defendant was using cocaine at the Grandinetti's trailer on the night of the murder. These notes were not turned over to the defense. Again, it appears that the State simply overlooked this information. There is no way of knowing whether Trial Counsel would have gathered from those interview notes that Defendant was using cocaine at the Grandinetti's trailer on the night of the murders.
5) Investigator Munster's field notes indicate that Defendant went to the Grandinetti's trailer on the night of November 26, 1987 with "two boys from West Virginia," presumably to purchase cocaine. These field notes were not turned over to the defense until 1997.
Trial court order at 17-18. The trial court ultimately rejected all of these claims by alluding to Ponticelli's refusal to fully disclose all of this information to his lawyer.
It cannot be denied that Ponticelli should be held accountable, both for the killings and for his refusal to aid in his defense afterwards. However, the State cannot get off so easily. Ponticelli's lack of cooperation is immaterial to an analysis of the State's obligation under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and the constitutional guarantee of due process. As Giglio and its progeny make clear, the State's obligation to see that a fair trial is conducted obligates it to speak up when it knows the facts are different than the *1109 testimony its witnesses present. See id. at 153-54, 92 S.Ct. 763. This obligation is obviously heightened when the State acknowledges the importance of the issue in question, Ponticelli's drug ingestion immediately preceding the killings.
I agree with the majority that Ponticelli is not entitled to relief from his convictions. I cannot agree, however, that he is not entitled to a new penalty phase when it is so apparent that a completely false picture was presented to the jury of Ponticelli's drug usage at the time of the crime.
NOTES
[1] The trial transcript spells "Keese" as "Keesee."
[2] The jury recommended death by a vote of nine to three.
[3] The "committed for pecuniary gain" aggravator and the "cold, calculated, and premeditated" (CCP) aggravator were established for both murders. The "heinous, atrocious and cruel" (HAC) aggravator was established for Nick Grandinetti's murder only. Ponticelli, 593 So.2d at 486, nn. 1-2.
[4] "In mitigation the court found that Ponticelli had no significant history of prior criminal activity, and that he was twenty years old at the time of the offense." Ponticelli, 593 So.2d at 486 n. 3.
[5] Ponticelli raised twelve claims on direct appeal. Ten of the claims alleged the trial court erred in (1) finding Ponticelli competent to stand trial; (2) denying Ponticelli's motion to suppress statements made to investigators; (3) preventing Ponticelli from presenting the testimony of an expert in the field of behavioral psychology; (4) limiting the defense's voir dire examination; (5) refusing to grant a mistrial after a state witness was allowed to testify regarding the potential danger he faced as a result of his testimony when the danger was never connected to Ponticelli; (6) admitting a photograph of the victim that was cumulative to other photographs and allowing extended publication of photographs to the jury; (7) permitting the State to elicit irrelevant and prejudicial testimony during the penalty phase; (8) finding the murder of Nick Grandinetti heinous, atrocious, or cruel (HAC); (9) finding the murders were committed in a cold, calculated, and premeditated manner (CCP); and (11) improperly considering valid, unrebutted mitigating factors. In addition, Ponticelli claimed that (10) the statutes authorizing the CCP and HAC aggravators are unconstitutionally vague and were applied in an arbitrary and capricious manner; and (12) Florida's capital sentencing statute is unconstitutional on its face and as applied. Ponticelli, 593 So.2d at 487. This Court found that claims (3), (4), and (6) merited no discussion. It also determined that Ponticelli's claims "regarding the constitutionality of the aggravating factors of [HAC] and [CCP]" and regarding the constitutionality of Florida's death penalty statute had been previously rejected. Id. at 487 n. 4 (citations omitted).
[6] Ponticelli's initial motion for postconviction relief was filed on April 10, 1995, and his fifth amended motion was filed on July 31, 1998.
[7] Huff v. State, 622 So.2d 982 (Fla.1993).
[8] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[9] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[10] The evidentiary hearings took place on the following dates: July 10-14, 2000; October 16-17, 2000; January 29-30, 2001; and May 24, 2001.
[11] Ponticelli's brief on appeal approaches this issue broadly, arguing that the State withheld all the information it had regarding Ponticelli's cocaine use on the night of the crimes. The record conclusively refutes this broad allegation; therefore, we address only those specific allegations that are not conclusively refuted by the record.
[12] Ed Brown, Warren Brown, and Brian Burgess were referred to as the "West Virginia boys" because they resided in West Virginia. On the weekend the homicides took place, they were visiting Keith Dotson in Florida.
[13] Ponticelli approaches this issue as if the State suppressed all evidence regarding the cocaine party. This is not the case. The most convincing evidence regarding the cocaine party came from Ed Brown's and Burgess's testimony at the evidentiary hearing, and both men testified that they had not told the State about the cocaine party.
[14] The investigator's field notes following Letson's interview read: "Went to someone's house to drop off girl. Both Tony and John are there. They are smoking coke out of an orange juice container." The testimony at the evidentiary hearing did not reveal the date on which Letson witnessed this. Letson did not testify at the evidentiary hearing.
[15] On cross-examination, Keesee testified that he had seen Ponticelli use cocaine at the Grandinettis' trailer on a number of prior occasions.
[16] At the evidentiary hearing, Keesee testified that when the state investigator questioned him the day after the murders, he told the investigator that he left the Grandinettis' trailer on November 27, 1987, because the cocaine usage there made him uncomfortable since he was with his brother who was in the Navy. In regard to Keesee's statements to the prosecutor, Keesee testified that he believed the prosecutor asked him, "Did you all do some cocaine [on the night of the crimes]?," and he responded, "Yes. We did; one line."
[17] At the evidentiary hearing, Keesee testified that he used a couple of lines of cocaine before coming to the courthouse and used another line or two at the courthouse an hour before he testified.
[18] At the evidentiary hearing, Keesee testified that when the state investigator interviewed Keesee the day after the homicides, the investigator searched Keesee's car and found drug paraphernalia. Keesee testified that he interpreted the investigator's failure to seize this paraphernalia as evidence the State would reward him for cooperating in Ponticelli's case. Keesee was also facing charges at the time Ponticelli's case was investigated. One month before his deposition, he was charged with possession of drugs, and he was in custody for this when he testified before the grand jury in Ponticelli's case. At the evidentiary hearing, the trial judge asked Keesee what sentence he had actually received and whether he had any prior convictions. After Keesee answered these questions, the judge stated that he thought Keesee's sentence was harsher than most.
[19] "BM" is the state investigator's initials.
[20] Ponticelli also claims Warren Brown and Keith Dotson testified falsely as well. Neither man testified at the evidentiary hearing, and Ponticelli has provided no evidence to support these allegations. Therefore, we deny this claim without further discussion.
[21] There was a question whether Burgess's testimony at the evidentiary hearing was actually inconsistent with his testimony at trial. Burgess testified at trial that he met Ponticelli on Friday at six or seven, and testimony at the evidentiary hearing revealed that the Thursday night cocaine party extended into the early morning hours on Friday. At the evidentiary hearing, Burgess testified that he could not remember if, in his trial testimony, he was referring to "a.m." or "p.m."
[22] Crown described "executive functions" as the ability to problem-solve, concentrate, and comprehend the long-term consequences of one's behavior.
[23] For example, Branch pointed to the testimony of John Como, Ponticelli's cousin, whose testimony at the evidentiary hearing described an incident in which Ponticelli had acted extremely paranoid after using cocaine.
[24] The record also reveals that Dr. Mills' competency evaluation lasted only fifteen minutes because Ponticelli refused to speak with him. We do not find that Dr. Mills' competency evaluation was inadequate, only that counsel should not have considered it "a reliable substitute for a thorough mitigation evaluation." Arbelaez, 898 So.2d at 34; cf. Porter v. State, 788 So.2d 917, 922-23 (Fla.2001) (recognizing that a defendant's failure to speak with the mental health expert whom defense counsel sent to evaluate him was a significant factor in leading the court to deny an ineffectiveness claim).
[25] Ponticelli asked Dr. Mills to assume that Ponticelli had no history of cocaine abuse until Ponticelli returned from his visit to New York in October 1987. The unrefuted testimony at the evidentiary hearing revealed that Ponticelli was heavily abusing cocaine by the age of sixteen.
[26] The CCP aggravator was established for Ralph Grandinetti's murder alone, and the "committed for pecuniary gain" aggravator was established for both murders.
[27] The only relevant piece of the lay witness testimony presented at the evidentiary hearing, but not at trial, was Ponticelli's cocaine use as an adolescent. Given the fact that Dr. Mills had no difficulty testifying to the mental health mitigation without it, we find no reasonable probability that this additional evidence would have led the trial court to establish either mitigator or find that these mitigators outweighed the weighty aggravators in this case.
[28] Dr. Poettner, who evaluated Ponticelli in preparation for the evidentiary hearing, determined Ponticelli's verbal IQ was 102. This was not refuted at the evidentiary hearing.
[29] As we discussed in regard to Ponticelli's Giglio and Brady claims, Ponticelli refused to speak with defense counsel regarding his cocaine use; counsel repeatedly asked Keesee if he had seen Ponticelli use cocaine, and Keesee denied it; and the West Virginia boys testified that they first met Ponticelli when he appeared at Dotson's immediately before the crimes. Turner's deposition testimony does not indicate that he saw Ponticelli use cocaine immediately before the murders.
[30] Ponticelli's brief on appeal begins with nearly a full page of clauses alleging instances where defense counsel was ineffective. We address only those that were supported with a complete claim later in the brief. See Whitfield v. State, 923 So.2d 375, 378-79 (Fla.2005) (summarily affirming the trial court's denial of claims raised as conclusory statements in the appellant's brief).
[31] As we recognized earlier, Dr. Mills' report was based on a fifteen-minute evaluation. The report stated that it was "essentially impossible" to record Ponticelli's testimony because there were breaks in it, and it did not make sense. At the evidentiary hearing, Dr. Krop testified that Ponticelli had intentionally refused to speak with Dr. Mills because a fellow inmate had advised against it.
[32] Dr. Krop interviewed Ponticelli's parents before issuing his report in 1988, and Ponticelli's parents confirmed this diagnosis. They told Dr. Krop that Ponticelli had not exhibited any significant medical problems or difficulties at birth. Dr. Krop's report indicated that Ponticelli appeared well-nourished, did not exhibit loose associations, tangentiality, thought block, poor concentration, or poor attention span, and, according to Dr. Poettner's findings, had a verbal IQ of 102. While Ponticelli admitted he had used crack cocaine in Florida, he did not discuss the extent of the cocaine use. Dr. Krop's initial report contradicted both Dr. Mills' report and Dr. Herkov's findings, and Dr. Herkov recognized that Dr. Krop's report was based on an evaluation that occurred sixteen days before trial.
[33] Dr. Herkov defined a delusion as a fixed, false belief that is not rational. Dr. Herkov based this diagnosis on Ponticelli's statements that he believed God spoke to him by making his arm tingle and Ponticelli's reports of euphoria (i.e., a burst of incredible energy that leads one to sleep and eat very little). Dr. Herkov also testified that Ponticelli's willingness to cooperate with postconviction counsel was evidence that his delusion was waning now that the initial stress of incarceration had worn off.
[34] Dr. Crown testified that "cocaine kindling" is a disorder in which the brain's neurotransmitters are altered in such a way as to allow the cocaine to have a greater effect in a shorter period of time. This is very prevalent in chronic cocaine users, especially those who had some brain damage before using cocaine and who began using cocaine during adolescence. Crown testified that his report was supported by Ponticelli's reports that he suffered headaches immediately following his incarceration.
[35] Much of the testimony presented at the evidentiary hearing regarding Ponticelli's mental health is summarized in the discussion of the facts surrounding Ponticelli's ability to establish ineffective assistance of counsel during the penalty phase.
[36] The appellant's brief alleges that trial counsel vouched for the state investigator's credibility many times at trial, but it fails to provide a specific citation. Because the trial court's November 1, 2002, order cites to the following two statements, we will address this part of Ponticelli's claim.

The first statement came in the context of a situation in which defense counsel objected to the State's motion to introduce an exhibit during the state investigator's testimony. Defense counsel stated:
Judge I think it's pretty clear the [exhibit] has not been tied to the defendant by anything or anybody else. . . . I'm certain [the state investigator] found it out there where he says he found it, but that particular [exhibit] has not been tied to the defendant in this charge. It's immaterial, it's irrelevant, and at this point hasn't been shown to be either material or relevant.
The second cited statement came during defense counsel's cross-examination of the state investigator when defense counsel stated:
You probably couldn't remember Investigator. . . . This thing is 135 pages long, so I'm not surprised that you don't remember. Let me see if I can refresh your memory a little bit.
[37] Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Even if this claim were not procedurally barred, the record conclusively establishes that it is without merit. In Ake, the United States Supreme Court held that "where an indigent defendant demonstrates to the trial judge that his sanity at the time of the offense will be a significant factor at trial, the state must `assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.'" Hodges v. State, 885 So.2d 338, 353 (Fla.2004) (quoting Ake, 470 U.S. at 83, 105 S.Ct. 1087). There is no evidence that the State failed in its obligation because the trial court appointed three mental health experts to evaluate Ponticelli in preparation for the August 2, 1988, competency hearing, and the State appointed a fourth expert to evaluate Ponticelli after the competency hearing but before trial. Even if this claim were not procedurally barred, Ponticelli has not established that the State failed in its obligation under Ake. See id. at 353 (denying Ake claim where the defendant had "access to multiple mental health experts prior to trial, and the experts performed all of the essential tasks required by Ake").