995 So.2d 191 (2008)
Michael RIVERA, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1873.
Supreme Court of Florida.
June 12, 2008.
Rehearing Denied November 17, 2008.
*192 Neal A. Dupree, Capital Collateral Regional Counsel, Fort Lauderdale, FL, and Martin J. McClain, Special Assistant, CCR Counsel, Southern Region, Wilton Manors, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Michael Rivera appeals an order summarily denying his successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we remand for an evidentiary hearing on Rivera's newly discovered evidence claim and his claims of State misconduct under the decisions of the United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In all other respects, we affirm the trial court's summary denial.

*193 PROCEDURAL HISTORY
Rivera was convicted of first-degree murder and sentenced to death. The facts of the case are set forth in Rivera v. State, 561 So.2d 536, 537-38 (Fla.1990) (Rivera I). We affirmed Rivera's conviction and sentence on appeal. Id. at 541. On October 31, 1991, Rivera filed a rule 3.850 motion to vacate judgment and sentence as well as a motion to disqualify the trial court judge. Rivera v. State, 717 So.2d 477, 479 (Fla.1998) (Rivera II). He subsequently filed two amended 3.850 motions and two additional motions to disqualify the trial judge. Id. The trial court denied all relief. Id. We ultimately affirmed the trial court's denial of postconviction relief on all but one issue, the summary denial of the motion as it pertained to the penalty phase performance of counsel, and remanded for an evidentiary hearing. Id. at 487. However, when the trial court denied relief on this issue we affirmed and also denied habeas corpus relief. Rivera v. State, 859 So.2d 495, 499 (Fla.2003) (Rivera III).
During the period of the remand on the issue of ineffective assistance of counsel during the penalty phase, Rivera filed another 3.850 motion on September 29, 1999. While the trial court denied relief on September 26, 2001, regarding the penalty phase ineffective assistance of counsel claim, the trial court did not address the issues raised in this motion. On September 28, 2001, Rivera filed an amended 3.850 motion for postconviction relief. While the appeal from the trial court's denial of postconviction relief on the penalty phase ineffective assistance of counsel claim was pending, we authorized the trial court to consider the postconviction motions that Rivera had filed in 1999 and 2001 and directed the trial court to utilize the versions of the criminal rules in effect prior to October 1, 2001. Rivera v. State, No. SC01-2523 (Fla. July 11, 2002). On January 20, 2004, Rivera filed another 3.850 motion for postconviction relief in which he claimed (1) Rivera was deprived of due process under Giglio when the prosecution intentionally permitted false or misleading evidence to be presented to Rivera's jury and used to obtain a conviction; (2) Rivera was deprived of his right to due process and other constitutional rights under Brady because the State failed to disclose evidence which was material and exculpatory in nature or presented misleading evidence, or defense counsel unreasonably failed to discover and present exculpatory evidence, or new evidence establishes manifest injustice; (3) Rivera was denied a fair trial and postconviction proceedings due to the trial judge's bias and predetermination of the issues; and (4) the results of DNA testing constitute newly discovered exculpatory evidence that, when considered with other evidence, establishes Rivera's entitlement to a new trial.
The trial court held a Huff[1] hearing on July 27, 2004, and on May 10, 2005, summarily denied all postconviction relief without an evidentiary hearing on any of the claims. Afterward, Rivera filed a motion for rehearing and also filed a supplement to the motion for rehearing alleging that the trial court should consider federal habeas proceedings that were conducted in another case involving Frank Zuccarello, an important witness who testified against Rivera at trial. The trial court denied the motion for rehearing. This appeal follows.

ANALYSIS

JUDICIAL BIAS
Rivera argues that the trial court erred in summarily dismissing his claim that he *194 was denied a fair trial and postconviction proceeding due to the trial judge's bias and predetermination of the issues. We disagree.
Rivera reasserts several issues previously decided in Rivera II. For example, Rivera again alleges the original trial judge's predisposition to rule against him as evidenced in an article published in the Fort Lauderdale Sun-Sentinel in 1986. Rivera again claims the trial judge considered testimony outside the record as evidenced by a letter the judge wrote to the Florida Parole Commission. Also, Rivera again alleges an inappropriate relationship among the jury foreman, the sheriff, and the trial judge. The postconviction court properly found these issues to be procedurally barred. Rivera previously raised them, and we previously denied them as legally insufficient or found them to be procedurally barred. See Rivera II, 717 So.2d at 480-82 & n. 3.
In addition to rearguing several judicial bias claims, Rivera also introduces a New Times Broward-Palm Beach article published on June 28, 2001, as new evidence demonstrative of the trial judge's bias during his involvement in this case. The article quoted the trial judge as saying, "I don't remember any particular thing that proved he was guilty, but I had great confidence in the prosecutor, Kelly Hancock." The judge also stated, "I wanted the defendant to get a fair trial at all costs, although my personal beliefs might not have been the same." The postconviction court dismissed this claim as successive. Alternatively, the trial court concluded that the claim was legally insufficient.
We conclude the trial judge's statements in the 2001 article cannot be reasonably expected to affect or impair the fairness of Rivera's postconviction relief proceeding. See Fla.Code Jud. Conduct, Canon 3 B(9) ("A judge shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness...."). The record demonstrates that, in fact, at the time Rivera filed his 2001 postconviction motion raising the judicial bias claim, the original trial judge quoted in the press was retired and a different judge was presiding over Rivera's postconviction proceeding. Cf. Suarez v. Dugger, 527 So.2d 190, 191-92 (Fla.1988) (finding that statements that the trial judge had made to a newspaper warranted the judge's disqualification from presiding over the postconviction proceedings).
Accordingly, we find no error in the trial court's dismissal of Rivera's judicial bias claim.

GIGLIO AND BRADY

Rivera asserts that the trial court erred in summarily denying his claim that the State intentionally permitted false or misleading evidence to be presented to the jury in violation of Giglio. Rivera's allegations pertain to Frank Zuccarello, a jailhouse informant who testified about incriminating statements made by Rivera at the Broward County Jail. Rivera argues that Zuccarello falsely testified at trial that he had not received a deal for his testimony. Rivera claims that a recently discovered plea agreement reveals this testimony to be false. Rivera also argues that other recently discovered documents including jail receipts, a law enforcement synopsis of a conversation with Zuccarello, and a law enforcement memorandum of an interview with Zuccarello corroborate the information in the plea offer and further establish that Zuccarello was working as a confidential informant for law enforcement at the time he gave evidence against Rivera.
*195 Rivera also asserts that the trial court erred in summarily denying his claim that the State withheld material, favorable information in violation of Brady or that trial counsel unreasonably failed to discover and present exculpatory evidence in violation of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Rivera argues that the State withheld or defense counsel unreasonably failed to discover Frank Zuccarello's extensive involvement with law enforcement. He bases his argument on newspaper articles from 1998 to 2001 concerning Zuccarello. The articles discussed Zuccarello's role in testifying against Joyce Cohen in her 1989 trial for the March 1986 slaying of her husband, Stanley Cohen. The articles suggested that Zuccarello had lied at Cohen's trial and in another homicide investigation concerning the 1984 murder of Charles Hodek. Rivera also bases his argument on jail receipts for Zuccarello to meet with law enforcement officers during and before the time that Zuccarello was with Rivera, memorandums on polygraph examinations of Zuccarello in other cases, a synopsis of a conversation with Zuccarello and a memorandum on an interview with Zuccarello during the time that he was incarcerated with Rivera, a plea offer to Zuccarello, and a prosecution memorandum on whether Zuccarello should receive gain time. He also suggests that the State withheld or counsel unreasonably failed to discover that Zuccarello lied in polygraph examinations in the Cohen case and in the Cohen and Hodek investigations and trials. Second, Rivera argues that he was denied his right to counsel because the aforementioned documents demonstrate that Zuccarello was acting as a state agent when Rivera allegedly confessed to him. Third, he argues that he was denied his right to counsel and right to remain silent when he was interrogated by law enforcement officers. He bases this claim on newspaper articles about investigations into similar misconduct by Broward County sheriff's officers in other cases and a newspaper article that quotes Lieutenant Rios of the Broward County Sheriff's Office as suggesting that Rivera may not have waived his right to remain silent or right to counsel on February 18, 1986. Rivera asserts that all of the aforementioned information impeaches the credibility of Zuccarello and the law enforcement officers involved in his case. He also argues that if the State had disclosed such information, Rivera would have been able to investigate law enforcement's relationship with the other informants more closely and develop further impeachment evidence against them.
Without holding an evidentiary hearing, the trial court dismissed Rivera's Giglio and Brady claims as successive because the information Rivera said he did not have was known or could have been known prior to the filing of his first postconviction motion. The trial court also found that even if the claims were not successive, Rivera failed to establish his entitlement to relief on the merits.
We do not agree with the trial court's conclusion that the record conclusively demonstrates these claims are procedurally barred. The bar against successive motions can be overcome if the movant can show that the grounds asserted were not known and could not have been known to the movant at the time of the previous motion. Zeigler v. State, 632 So.2d 48, 51 (Fla.1993). Rivera alleges that he did not have the plea offer to Zuccarello or other key State documents at the time of trial or during the prior postconviction proceedings. Since no evidentiary hearing has been held, we must accept these allegations as true to the extent they are not refuted by the record. *196 See Peede v. State, 748 So.2d 253, 257 (Fla.1999).
Importantly, the record does not conclusively refute Rivera's allegations about his diligence in pursuing these claims. In the public records litigation surrounding the filing of Rivera's initial postconviction motion, Rivera repeatedly sought information about Zuccarello. While the State alleges that it complied with Rivera's requests, the records of the prior proceedings do not clearly establish or identify what materials were turned over to Rivera. In fact, certain materials concerning Zuccarello appear to have been withheld. The records from the first postconviction proceedings suggest that Rivera's efforts to discover information about Zuccarello were repeatedly avoided by the State through its limited responses to public records requests. Based on the record before us, the State has not sufficiently demonstrated that these claims are procedurally barred as successive.
Further, Rivera asserts that Zuccarello, the State's star witness at trial, gave testimony at Rivera's trial regarding his connection with law enforcement agencies as well as his motivation for testifying which sharply contrasts with the portrait of Zuccarello that has been alleged in the postconviction pleadings. Zuccarello testified at Rivera's trial that he notified law enforcement officers about statements that Rivera made to him simply because "I [thought] what he did was a sick act." Zuccarello repeatedly denied being promised anything for his testimony and repeatedly denied that any deal had been made. Broward County sheriff's officers corroborated this testimony; Detectives Philip Amabile and Richard Scheff both testified that they never promised Zuccarello anything. While Zuccarello testified that he was convicted of multiple felonies in two separate cases and that he had a plea agreement, he never testified about the specific terms, conditions, or consideration for his plea agreement. Furthermore, Zuccarello never testified that he was cooperating in the investigations of home invasion robberies or other homicides. In sum, Rivera asserts that Zuccarello's testimony suggested that he was simply acting as a good citizen who was appalled at Rivera's conduct, and he was not connected with law enforcement in any way. Zuccarello was impeached at trial only about his criminal record, and was not impeached about his connection with law enforcement or his personal incentive and gain for testifying against Rivera.
In contrast to this trial testimony, Rivera's postconviction filings assert that Zuccarello had an extensive involvement with law enforcement agencies at the time of Rivera's trial. The documents on which Rivera relies to support his postconviction claims reveal that Zuccarello was communicating with law enforcement officers about various criminal investigations before, during, and after his incarceration with Rivera at the Broward County Jail. He was in contact with law enforcement officers and prosecutors concerning investigations in Dade and Broward counties about multiple home invasion robberies and at least two other homicides. Moreover, he allegedly received a plea offer requiring him "to testify at all proceedings in which he is subpoenaed" and providing that "[a]t the time of sentencing [of Zuccarello]... the State will bring forward all law enforcement personnel familiar with the cases and the efforts of the defendant for the Court's consideration in sentencing." In another of the filings Zuccarello is described as a police confidential informant.
We cannot agree with the trial court's conclusion that these claims are sufficiently rebutted by the record so as to make an evidentiary hearing unnecessary. *197 Under our postconviction rules, we must accept Rivera's claims as true and direct an evidentiary hearing on their validity unless the record conclusively demonstrates that Rivera is not entitled to relief. See Fla. R.Crim. P. 3.850(d); see also Floyd v. State, 808 So.2d 175, 182 (Fla. 2002) ("Under rule 3.850, a postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief.").[2] Here, the record does not conclusively refute Rivera's extensive factual allegations that the State knowingly presented false or misleading testimony in violation of Giglio[3] and withheld favorable evidence in violation of Brady.[4] While there may be valid explanations to refute these allegations, the State has not demonstrated that those explanations are apparent on the face of the record. Accordingly, we find that Rivera's allegations are sufficient to require an evidentiary hearing with regard to whether there were Giglio or Brady violations.

NEWLY DISCOVERED DNA EVIDENCE
Rivera further asserts that the trial court erred in summarily denying, without a hearing, his claim that the results of recent DNA testing constitute important newly discovered physical evidence in his favor that, when considered with other evidence, establish his entitlement to a new trial. Rivera alleges that recent DNA testing of hair which was introduced into evidence at trial conclusively establishes that the hair was not from the victim. Rivera also asserts that DNA testing of hairs that were found with the victim's body and were discussed in an affidavit in support of a search warrant also indicates that Rivera was definitely not the source of most of the hairs and probably not the source of others. Without holding an evidentiary hearing, the trial court denied this claim, finding that the DNA evidence would not exonerate Rivera. We conclude that the trial court erred in failing to hold an evidentiary hearing on this claim.
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known to the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not *198 have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla. 1998).
At trial, the State presented evidence to support the theory that the crime had occurred in a van that Rivera had borrowed from his friend, Mark Peters.[5] In particular, the State presented the testimony of Howard Seiden, an expert in hair identification and comparison. Seiden testified that he received hair samples collected from the van. He testified that "the hair from the bed of the van could be concluded as being a source from the victim." In opening and closing statements, the State then referred to the hair found in the van as being consistent with the victim's hair.[6]
In his 2004 postconviction motion, Rivera alleged that the results of DNA testing of hairs from the van and of hairs found on the victim's body constitute newly discovered evidence favorable to his claim of innocence. Rivera claims that DNA testing establishes that the hair found in Mark Peters' van did not come from the victim and that the hairs found with the victim's body probably did not come from Rivera. Citing the lack of physical evidence connecting him to the crime, Rivera contends that the trial court should have held an evidentiary hearing. We agree. We conclude that this evidence, when viewed in conjunction with Rivera's Giglio and Brady claims as well as Mark Peters' testimony that he, and not Rivera, was in possession of the van at the time of the crime, is sufficient to warrant an evidentiary hearing on whether it is of such nature that it would probably produce an acquittal on retrial.

SUPPLEMENT TO MOTION FOR REHEARING
Rivera asserts that the trial court should have granted him an opportunity to investigate based on allegations in his supplement to his motion for rehearing. *199 Rivera argues that the trial court denied him due process when it foreclosed his opportunity to obtain transcripts from a federal evidentiary hearing concerning Frank Zuccarello's testimony in another case, the 1986 murder of Stanley Cohen, and prevented him from presenting claims arising from such information. We disagree. Rivera was not seeking to supplement a motion that had not yet been ruled upon by the trial court; rather, the trial court had already denied postconviction relief, and the only issue pending was the motion for rehearing. Cf. Gaskin v. State, 737 So.2d 509, 518 (Fla.1999) (holding that it was error for the trial court to not consider the merits of new allegations in a timely filed amended postconviction motion), receded from on other grounds by Nelson v. State, 875 So.2d 579, 583 (Fla. 2004); McConn v. State, 708 So.2d 308, 310 (Fla. 2d DCA 1998) (stating that when a defendant is requesting leave to supplement a postconviction motion by adding more information on an issue initially raised in a first motion for postconviction relief, a court should allow such a supplement). Moreover, the grant or denial of a motion for rehearing is a matter within the discretion of the trial court. Dries v. State, 899 So.2d 489, 489 (Fla. 2d DCA 2005); cf. Huff v. State, 762 So.2d 476, 481 (Fla.2000) (stating that the standard of review for a trial court's determination regarding a motion to amend a postconviction motion is whether there was an abuse of discretion).
Nevertheless, our affirmance on this issue is without prejudice to Rivera to submit evidence of the federal proceedings involving Zuccarello at the postconviction evidentiary hearing on remand to the extent those proceedings can be demonstrated to be relevant to the issues raised.

CONCLUSION
In light of the above analysis, we affirm in part and reverse in part the trial court's summary denial of Rivera's motion for postconviction relief and remand this case for the trial court to conduct an evidentiary hearing as outlined above.
It is so ordered.
LEWIS, C.J., and ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which CANTERO and BELL, JJ., concur.
WELLS, J., concurring in part and dissenting in part.
I concur in the portion of the majority's decision affirming the summary denial of Rivera's judicial bias claim. However, I dissent as to the portion of the decision that remands for an evidentiary hearing on Rivera's claims of State misconduct under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and on his newly discovered evidence claim.
The majority opinion sets out the procedural history of Rivera's case. Because the chronology of his postconviction litigation is important to the analysis of the claims currently before this Court, I repeat some of the relevant history.
 October 31, 1991: Rivera filed his initial postconviction motion.
 June 22, 1995: The trial court denied the initial postconviction motion.
 June 11, 1998: This Court remanded to the trial court for an evidentiary hearing on Rivera's penalty-phase ineffective assistance of counsel claim.
 April 26-27, 1999: The trial court held an evidentiary hearing on Rivera's penalty-phase ineffective assistance of counsel claim.

*200  October 1, 1999: Rivera filed a successive postconviction motion raising additional guilt-phase claims based on newly discovered evidence, Giglio, and Brady.

 September 26, 2001: The trial court denied relief on Rivera's penalty-phase ineffective assistance of counsel claim raised in his initial postconviction motion.
 September 28, 2001: Rivera filed an amended successive postconviction motion, which superseded his October 1999 motion.
 July 11, 2002: This Court ordered the trial court to consider Rivera's successive motion "without delay." Rivera v. State, No. SC01-2523 (Fla. order filed July 11, 2002).
 September 11, 2003: This Court affirmed the trial court's denial of relief on the penalty-phase ineffective assistance of counsel claim raised in Rivera's initial motion and denied Rivera's petition for a writ of habeas corpus.
 January 20, 2004: Rivera filed a second amended successive postconviction motion, which superseded his September 2001 motion. This second amended successive postconviction motion relates to the original filing date of October 1, 1999.
 May 10, 2005: The trial court summarily denied Rivera's second amended successive postconviction motion. The current appeal followed.
In summary, Rivera has had two postconviction motions adjudicatedthe initial postconviction motion, in which litigation was concluded by this Court in September 2003, and the instant successive motion, which was originally filed in October 1999, and was summarily denied by the trial court in May 2005.
Accordingly, Rivera's preliminary burden in the current postconviction proceeding is to demonstrate that his claims were not raised in his initial postconviction motion and could not have been raised in the initial postconviction motion by the exercise of due diligence. Florida Rule of Criminal Procedure 3.850(c) requires a successive postconviction motion to include "the reason or reasons the claim or claims raised in the present motion were not raised in the former motion or motions." To be entitled to an evidentiary hearing, Rivera also must present allegations constituting a prima facie case for relief. The movant in a postconviction motion filed pursuant to rule 3.850 in a capital case is not entitled to an evidentiary hearing if "(1) the motion, files, and records in the case conclusively show that the [movant] is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). I would hold that the trial court did not err in summarily denying relief on all claims because Rivera's successive postconviction motion did not satisfy these procedural and substantive requirements.

GIGLIO CLAIM
I agree with the trial court that Rivera's Giglio[7] claim is procedurally barred. In the instant motion and appeal, Rivera argues that the State violated Giglio by allowing State witness Frank Zuccarello to falsely testify that he did not make a "plea deal" relating to his testimony in the Rivera case. Rivera acknowledges that in 1995 he amended his initial postconviction motion to include the following allegations:

*201 6. At trial, one of the State's key witnesses was Frank Zuccarello, a professional informant. Mr. Zuccarello testified many times previously in exchange for lenient or favorable treatment.
7. Despite Mr. Zuccarello's history of making deals with the State, he testified that the State had made no promises to him and there was no deal. (R. 1407, 1410).
8. However, the State had written several letters in an effort to secure lenient treatment for Mr. Zuccarello. (See Appendix B). Further, the State made no attempt to correct Mr. Zuccarello's apparently misleading testimony.
Rivera explains that he raised the same claim in the instant motion because he has recently discovered a written plea offer and other documents demonstrating that Zuccarello cooperated with law enforcement officers as an informant. Rivera asserts that the instant claim is timely because the State failed to disclose the plea offer and the other documents, and defense counsel did not discover the documents until mid-2002.
An evidentiary hearing was held on Rivera's 1995 claim. Rivera presented letters written by prosecuting attorneys stating that Zuccarello had assisted them in other cases. The trial court denied relief, and this Court affirmed the denial on appeal. State v. Rivera, No. 86-11716CF (Fla. 17th Cir. order filed June 22, 1995); Rivera v. State, 717 So.2d 477 (Fla.1998). Defense counsel had an obligation to diligently investigate the Giglio claim relating to Zuccarello's status as a police informant at that time. Rivera's claim that Zuccarello testified falsely and that the State knowingly presented or failed to correct false testimony has been ruled upon. Rivera is not permitted to relitigate the claim. See Schwab v. State, 969 So.2d 318, 325 (Fla. 2007) ("Schwab had an opportunity to pursue this topic as potential mitigation and failed to do so. Thus, he is now procedurally barred from doing so."). Here, Rivera's allegations that documents obtained in 2002 establish that Zuccarello acted as an informant and testified pursuant to a plea deal will entitle Rivera to postconviction relief only if the documents rise to the level of newly discovered evidence or if they were suppressed by the State in violation of Brady.

BRADY CLAIM
While I acknowledge that, taking Rivera's allegations as true, his claim that the State suppressed documents in violation of Brady is not procedurally barred, I would find that Rivera's allegations do not establish that he is entitled to relief. To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000).
As discussed in the majority opinion, Rivera alleges that the State failed to disclose a written plea offer that Zuccarello accepted; prisoner transport receipts dated April 1, 4, and 17, and July 17, 1986, which demonstrate that Zuccarello was released to law enforcement officers; a document titled "Synopsis of conversation with FRANK ZUCCARELLO on Friday, April 4, 1986," which summarizes what Zuccarello told Broward and Miami-Dade County law enforcement officers about home invasion robberies in those counties; a document titled "April 19, 1986, Interview with Frank Zuccarello," a police report in which Detective Joseph Gross of the Metro Dade Police Department referred *202 to Zuccarello as a "CI" or confidential informant; a memorandum dated June 24, 1986, from Robert Rios to Sergeant Steve Vinson of the Miami Police Department that discussed a polygraph examination of Zuccarello about an unrelated Miami homicide; a portion of a Miami Police Department report discussing Zuccarello's deceptive behavior on a June 7, 1986, polygraph examination about an unrelated Miami homicide; and a memorandum dated June 28, 1987, from Corporal Iglesias of the Dade County Jail discussing Zuccarello's behavior in prison. Rivera argues that this information could have been used to impeach Zuccarello and that the impact of these alleged Brady materials should be considered in conjunction with newspaper articles from the late 1990s discussing Zuccarello's participation in two unrelated homicide investigations, allegedly newly discovered evidence that Broward Sheriff's Office personnel mishandled other murder investigations around the time of Rivera's case, and DNA testing recently completed in the Rivera case.[8] I would affirm the summary denial of Rivera's Brady claim because Rivera's allegations *203 fail to state a legally sufficient claim for relief. Rivera's allegations do not establish that the allegedly undisclosed evidence is material.
"[T]he `ultimate test' in determining if a Brady violation occurred is whether `confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different.'" Way, 760 So.2d at 912 (quoting Young v. State, 739 So.2d 553, 559 (Fla. 1999)). This Court follows the Supreme Court's standard for determining materiality:
[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."
Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citation omitted) (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). I do not see how this allegedly suppressed evidence of Zuccarello's cooperation with police would put this case in such a different light as to undermine confidence in the verdict.
First, the June 1987 memorandum about Zuccarello's behavior in jail was written after Rivera's April 1987 trial and thus could not have been used to impeach Zuccarello during the trial. Accordingly, even if the document was suppressed, Rivera's allegations about it fail to satisfy the materiality prong.
Second, Rivera has not demonstrated that the documents discussing Zuccarello's performance on polygraph examinations would be admissible as impeachment evidence. This Court rejected a similar Brady argument in Smith v. State, 931 So.2d 790, 799 (Fla.2006), where the defendant "did not rebut the State's evidence that such a report was disclosed and further did not demonstrate that polygraph tests were admissible at trial as impeachment evidence." See also Sochor v. State, 883 So.2d 766, 787 (Fla.2004) (affirming summary denial of Brady claim because results of polygraph tests would not have been admissible at trial without consent of both parties). Evidence that is not admissible cannot be material.
Third, the written plea offer, the prisoner transport receipts, and the police reports documenting that Zuccarello assisted law enforcement officers with the investigation of crimes other than the murder of Staci Jazvac do not undermine my confidence in the verdict. The extent to which Zuccarello was already impeached and the extent to which his testimony was corroborated by other witnesses are relevant factors in the materiality analysis. For example, in Ponticelli v. State, 941 So.2d 1073, 1085-86 (Fla.2006), this Court found that an allegedly undisclosed note assuring an inmate witness that "his cooperation would be remembered with favor before mitigating judge" was not material given the "significant amount of evidence impeaching [the inmate's] credibility as well as the State's credibility in calling him to testify." In that case, the inmate testified that he had previously worked undercover for the State, that he had contacted the local sheriff's department with incriminating information on his fellow prisoners, that he had testified as a jailhouse informant on at least one occasion, and that his twenty-six prior felony convictions all involved crimes of dishonesty. Id.
*204 While Zuccarello did not testify at trial that he assisted law enforcement by serving as an informant outside the context of the Rivera investigation, his testimony is otherwise similar to that at issue in Ponticelli. Zuccarello testified that he pleaded guilty to twenty-seven felonies in two separate cases, including robbery, armed burglary, aggravated assault, home invasions, resisting arrest, and credit card crimes. During cross-examination, Zuccarello explained that he had pleaded to the felonies but had not been sentenced at the time he made his statement regarding Rivera to Detective Amabile of the Broward Sheriff's Office on July 16, 1986. Between the time of that statement in July 1986 and his testifying on behalf of the State in Rivera's trial in April 1987, Zuccarello was given a seven-year sentence for the crimes committed in Broward County and a five-year sentence for the crimes committed in Dade County, to run concurrently. When asked during cross-examination if the State of Florida had made any deals with him regarding his testimony in the Rivera case, Zuccarello answered, "No, sir. Other than I had a mitigation filed and that's not guaranteed." Zuccarello explained that his motion would be before the judge "[s]ometime in May" and that he was "hoping that the judge will see that my sentence be reduced down to the same time that I got in Dade County."[9] Zuccarello agreed with defense counsel's statement that Zuccarello had "been in the system for a while now" and stated that he knew that he would likely serve a "little over half" of his five-year sentence. Zuccarello further testified that despite being sentenced to seven years in prison, as of the time of Rivera's trial, he had spent only three weeks in a prison facility and had otherwise been held in the Broward County Jail, where he met Rivera.
I would find that Zuccarello's credibility was already significantly impugned by his suspiciously short sentence for so many felony convictions and the pending motion to mitigate that was to be adjudicated shortly after Zuccarello's participation in the Rivera trial. While the jury was not informed of the exact terms of Zuccarello's prior plea, the jury was fully aware that Zuccarello had been given his seven-year sentence after making a statement about Rivera and that he hoped to have his sentenced reduced shortly after his participation in Rivera's trial.
Moreover, Zuccarello's testimony that Rivera confessed to attacking Jennifer Goetz and murdering Staci Jazvac was confirmed by other evidence. Detective Amabile testified that while being questioned about the Jazvac murder, Rivera admitted that he attacked Goetz. Jennifer Goetz testified about her experience in detail. Although she could not positively identify Rivera as her attacker, her account of the crime corresponded to Zuccarello's testimony of what Rivera told him. As for the Jazvac murder, in addition to Zuccarello, another fellow inmate and Rivera's former employer Starr Peck testified that Rivera confessed to them that he killed Staci Jazvac. A third inmate testified that Rivera said "Tony" killed Jazvac and that he heard Rivera refer to himself *205 as Tony. The State also introduced inculpatory statements made by Rivera to law enforcement officers. Detective Scheff of the Broward Sheriff's Office testified that Rivera told him and another law enforcement officer, "If I talk to you guys, I'll spend the next twenty years in jail." Detective Eastwood, also of the Broward Sheriff's Office, testified that Rivera told him that "[e]very time I get in a vehicle, I do something terrible," and when asked what he did to Staci Jazvac, Rivera responded, "Tom, I can't tell you. I don't want to go to jail. They'll kill me for what I've done." Finally, the State presented testimony establishing that Rivera was in the area of the abduction around the time Jazvac disappeared.
Therefore, in the context of this record, the documents indicating that Zuccarello met with law enforcement officers beyond the interaction discussed at trial, and the undated plea offer indicating that Zuccarello had the opportunity to plead guilty to charges in Broward County and cooperate with law enforcement in exchange for a fifteen-year maximum sentence with the attendance of law enforcement officers familiar with his efforts at sentencing do not cast Zuccarello's testimony in an entirely different light, much less "put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936.

INEFFECTIVE ASSISTANCE OF COUNSEL
As an alternative to his Brady and newly discovered evidence claims, Rivera argues that to the extent that trial counsel knew or should have known of the undisclosed and unpresented evidence, trial counsel rendered ineffective assistance of counsel. The trial court did not err in summarily denying this claim. The trial court correctly found that counsel could not be deficient for not discovering before April 1987 evidence that did not exist at that time. Thus, counsel was not ineffective for failing to discover the June 1987 memorandum by Corporal Iglesias, the DNA evidence, or the newspaper articles and investigations questioning the propriety of Broward Sheriff's Office personnel.
As for the other previously unpresented items, the ineffective assistance of counsel claim was correctly summarily denied because Rivera's allegations do not establish prejudice. Prejudice has already been analyzed relating to the alleged Brady materials because the materiality prong of Brady has been equated with the Strickland prejudice prong. Derrick v. State, 983 So.2d 443, ___ (Fla. 2008) (explaining that United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), expressly applied the Strickland standard of "reasonable probability" to Brady cases). For the same reasons discussed in reviewing his Brady claim, Rivera has not demonstrated that he was prejudiced by any deficiency on trial counsel's part in not discovering the plea offer, the prisoner transport receipts, the police reports documenting that Zuccarello assisted law enforcement officers with other investigations, and the memorandum and report discussing Zuccarello's performance on polygraph examinations. Rivera also fails to sufficiently allege that he was prejudiced by any deficiency on trial counsel's part in not discovering the allegedly newly discovered evidence. Rivera does not explain what admissible evidence effective counsel could have presented to further impeach Zuccarello, prove that Rivera's Sixth Amendment rights were violated during the investigation of his case, or otherwise call into question the propriety of the Broward Sheriff's Office's investigation. See Pietri v. State, 885 So.2d 245, 252 (Fla.2004) ("[C]ounsel cannot have been ineffective for failing to present inadmissible *206 evidence."). Accordingly, Rivera's allegations fail to establish prejudice.

NEWLY DISCOVERED DNA TESTING
Finally, as the majority explains, Rivera claims that recent DNA testing has established that the hairs found in Mark Peters' van did not come from the victim and that the hairs found on the victim's body probably did not come from Rivera. There is no dispute that the DNA testing is newly discovered evidence that could not have been raised until this proceeding. Thus, the only issue is the legal question of whether the evidence satisfies the second Jones prong. Unlike the majority, I do not think the trial court erred in summarily denying this claim. I agree with the trial court that in light of the considerable evidence of Rivera's guilt and the limited probative value of the hair evidence offered at trial, the newly discovered DNA testing is not of such a nature that it would probably produce an acquittal on retrial.
At Rivera's trial, the State presented evidence to support the theory that the crime had occurred in a van that Rivera borrowed from his friend, Mark Peters. In particular, the State presented the testimony of Howard Seiden, an expert in hair identification and comparison. Seiden testified that it was his "scientific opinion that the hair from the bed of the van could be concluded as being a source from the victim." Seiden then qualified his testimony, explaining, "With respect to hairs, I don't think of it as a fingerprint. It's not unique, so it's not to the exclusion of everyone else. Hairs do not contain enough microscopic characteristics to be able to exclude everyone else on a hair match." Seiden reiterated this point during cross-examination. He agreed with defense counsel's statement that "hairs don't possess a sufficient number of unique individual microscopic characteristics to be positively identified as having originated from the particular person, to the exclusion of all others." Seiden also agreed that the hair standards from Rivera did not "correlate" with hairs found on the clothing of the victim.
DNA testing has proven that the hairs found in the van did not originate from the victim and that the hairs found on the victim's body did not originate from Rivera. Rivera argues that this discovery is exculpatory. I do not agree.
The DNA testing of the hairs found on Jazvac's body does not tend to prove Rivera's innocence. While the presence of Rivera's hair on Jazvac would be incriminating, the absence of his hair does not prove that he did not commit the murder. It only proves that he did not leave behind hair evidence. The DNA testing is merely cumulative to the expert witness's testimony that the hairs found on the victim did not correlate to the Rivera standards and thus is not likely to produce an acquittal on retrial.
The State did present evidence that hairs consistent with those of Staci Jazvac were found in Mark Peters' van. However, it must be kept in mind that expert witness Seiden never testified that the hairs conclusively came from the victim. Instead, he repeatedly encouraged the jury to recognize the limitations of hair comparison analysis. The State likewise downplayed the significance of the hair comparison evidence. While reviewing the evidence during opening and closing statements, the State referred to the hairs found in the van as being consistent with Staci Jazvac's hair but reiterated Seiden's warning that hair comparison techniques *207 cannot produce definitive matches.[10]
In contrast to the limited probativeness of the hair analysis evidence, the State presented compelling evidence of Rivera's guilt, including Rivera's confessions to various witnesses and his incriminating statements to law enforcement officers. During closing arguments, the State urged the jury to rely on the confessions and statements to convict Rivera. This evidence is unaffected by the recent DNA testing. Accordingly, I find that the newly discovered DNA evidence is not of a nature that would probably produce an acquittal on retrial.

CONCLUSION
Based on the foregoing, I would affirm the trial court's summary denial of Rivera's successive postconviction motion in its entirety. Each of Rivera's claims is procedurally barred or fails to allege a prima facie claim for relief.
CANTERO and BELL, JJ., concur.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993).
[2] Although Rivera's motion was initially filed under rule 3.850, our current rule 3.851, governing capital postconviction motions, articulates this Court's long-time policy establishing a presumption in favor of holding evidentiary hearings. Even though evidentiary hearings on claims raised in successive rule 3.851 motions are not automatically required, we have encouraged courts to liberally allow such hearings on timely raised claims that are factually based and commonly require a hearing. See Amendments to Fla. Rules of Criminal Procedure 3.851, 3.852, & 3.993 & Fla. Rule of Judicial Admin. 2.050, 797 So.2d 1213, 1219 (Fla.2001).
[3] A Giglio claim alleges that a prosecutor knowingly presented false testimony against the defendant. See Giglio, 405 U.S. at 153-54, 92 S.Ct. 763. "To establish a Giglio violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." Guzman v. State, 868 So.2d 498, 505 (Fla.2003).
[4] Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000).
[5] Mark Peters did not testify at trial, but he testified at a 1995 evidentiary hearing held on Rivera's first postconviction motion. In that motion, Rivera asserted that the jury never heard the evidence of alibi witnesses who allegedly stated that Rivera was with them at the time of the murder. Rivera II, 717 So.2d at 482. Rivera claimed that Mark Peters presented unrebutted testimony at the evidentiary hearing that Rivera picked him up between 6 and 6:30 p.m. and remained with him for the next thirty to thirty-five minutes. Id. Rivera maintained that Peters' testimony provided him with an alibi. Id. We concluded that Peters' testimony would not have provided Rivera with an alibi for the crucial time after 7 p.m., the approximate time after which the victim was murdered. Id. at 483. Accordingly, we affirmed the trial court's denial of relief based on Rivera's claim of ineffective assistance of counsel for failure to present Peters as an alibi witness. Id. However, we also noted that Peters testified at the evidentiary hearing "that he was on his way home from work sometime between 6:15 and 7 p.m., after already dropping Rivera off at his house." Id. at 482.
[6] In his 1999 and 2001 postconviction motions as well as a motion for DNA testing, Rivera sought DNA testing of pantyhose found in the area where the victim's body was found, the victim's clothing, the hair from Mark Peters' van, and the hair found with the victim's body. While the appeal from the trial court's 2001 denial of postconviction relief on the penalty phase ineffective assistance of counsel claim was pending, we granted jurisdiction to the trial court to conduct DNA testing pursuant to section 925.11, Florida Statutes (2001), or Florida Rule of Criminal Procedure 3.853. Rivera v. State, No. SC01-2523 (Fla. Mar. 12, 2002). The parties filed a stipulation for an order to release evidence for DNA testing, and the trial court ordered the release of that evidence for DNA testing and allowed Broward Sheriff's Office Crime Laboratory to conduct the testing.
[7] A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006).
[8] In his successive motion, Rivera alleged that he is entitled to a new trial based on newly discovered evidence relating to Zuccarello and the Broward Sheriff's Office. To the extent that Rivera argues on appeal that the trial court erred in summarily denying this newly discovered evidence claim, his argument is without merit. To obtain a new trial based on newly discovered evidence, a defendant must demonstrate first that the evidence was not known by the trial court, the party, or counsel at the time of trial, and that the defendant or defense counsel could not have known of it by the use of diligence and second that the newly discovered evidence is of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998).

Many of Rivera's allegations are insufficient because he does not explain why the evidence could not have been presented during the initial postconviction proceedings. For example, his allegations relating to Lieutenant Rios's alleged comment that Rivera may not have waived his right to remain silent or his right to counsel when questioned on February 18, 1986, are insufficient because that issue should have been raised in Rivera's initial postconviction proceeding. In his initial motion, Rivera alleged that the trial judge's ruling that Rivera was not coerced into confessing after law enforcement officers refused to honor his request for counsel demonstrated that the trial judge was biased. Lieutenant Rios was subpoenaed to testify at the evidentiary hearing in that proceeding but was excused by defense counsel. In the instant proceeding, Rivera does not explain why Rios's conclusions about the interrogation were not presented in support of the initial postconviction motion. Thus, the claim is successive.
All of Rivera's allegations are insufficient because they fail to allege a prima facie case for relief under Jones. Taken as true, his allegations do not demonstrate that the allegedly newly discovered evidence would probably result in an acquittal. The newspaper articles discussing Zuccarello's dishonesty during the investigation and prosecution of two unrelated homicides and Lieutenant Rios's conclusions relating to Rivera's waiver of counsel are hearsay. Rivera has not offered any grounds upon which they could be admitted into evidence. As for the evidence disparaging the Broward Sheriff's Office, again, Rivera does not explain how any of this allegedly newly discovered evidence would be admissible to impeach the law enforcement officers who testified at Rivera's trial. Impeachment of a witness's character by specific acts of misconduct is prohibited under Florida law. See Fernandez v. State, 730 So.2d 277, 283 (Fla. 1999). Furthermore, such evidence would not be admissible pursuant to Williams v. State, 110 So.2d 654 (Fla.1959), unless Rivera demonstrated factual similarities between the other investigations and his case, which he has not done. See Keen v. State, 775 So.2d 263, 282 (Fla.2000). Other than the unsupported allegations relating to his waiver of counsel, Rivera fails to point to any misconduct by the Broward Sheriff's Office in his case.
Because none of the allegedly newly discovered evidence would be admissible at trial, it is not of a nature that would probably produce an acquittal on retrial, and it does not persuade me to conclude that the alleged Brady evidence is material.
[9] On redirect examination, the following exchange occurred between the prosecutor and Zuccarello, further revealing Zuccarello's possible personal interest in testifying on behalf of the State to the jury:

Q Now you indicated that you have a motion to mitigate before the Honorable Judge Grossman; correct?
A Yes, sir.
Q And it's some time in May. Nothing has been promised in reference to that; is that correct?
A No.
Q Do you hope someone speaks on your behalf and shows up to cooperate?
A Yes.
[10] During opening statements, the prosecutor stated:

They also checked Mark Peters' van, and you'll hear from Howard Seiden, who is with the Crime Lab, and he's an expert in hair examination.
He'll tell you he found a hair in Mark Peter's van, a long hair, I think it was like six or seven inches, and he compared that with the known hair of Staci Jazvac and that they are similar.
He will not come in and say they are exactly the same and they are Staci's. You can't do that in hair. It's not like fingerprints. He'll say it is similar to Staci Jazvac's hair in the van."
During closing statements, the prosecutor stated:
[Detective Edel] did vacuuming where? In back of this van. As a result what does he find? He finds hair.
Now they have the standards of Staci. So he sends those standards to Howard Seiden. You heard Howard Seiden. It just so happens that hair was consistent with Staci's. He can't say and he didn't say it's a positive identification, but he says it's consistent with Staci Jazvac's hair standard.
Remember, it's the defendant that has told Starr Peck that he dragged her into the van.